**Roy Neal SHELLING, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–98–01048–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 3, 2001.

Rehearing Overruled July 26, 2001.

Stanley G. Schneider, Houston, for appellant.

Rikke Burke Graber, John B. Holmes, Houston, for the State

Panel consists of Justices MIRABAL, TAFT, and PRICE.*

## EN BANC OPINION

TAFT, Justice.

Appellant, Roy Neal Shelling, Jr., was convicted by a jury of murder. The jury assessed punishment at confinement for life. Appellant presents five issues: four issues concern the State's references to the O.J. Simpson trial, and one issue concerns the trial court's permitting the State's use of peremptory strikes against minority venirepersons who agreed with the verdict in the Simpson trial. We affirm.

### Facts

Appellant and Lisa Robinson were married in 1994 and moved to the Houston area where they became teachers in the same school district. Appellant was a jealous, possessive husband who recorded his wife's conversations, went through her

---

* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

purse, and accused her of unfaithfulness. On one occasion in 1996, appellant repeatedly punched Robinson for working late. Robinson moved out more than once, but always returned.

In March 1997, appellant confronted Percie Melton, a female teacher with whom Robinson worked, to confirm that it was Melton, and not someone else, who gave Robinson perfume on her birthday. Melton had to show appellant the receipt. In June 1997, appellant moved out and returned to his family's home in Louisiana.

Robinson met the victim, Carlos McMahon, the following September when she bought eyeglasses at EyeMasters where McMahon worked. They became friends and had frequent phone conversations.

Appellant arrived unexpectedly at Robinson's apartment on the evening of October 7, 1997. She allowed him to stay overnight, but they did not sleep together. Appellant remained in the apartment the next day when Robinson left for work.

Appellant walked into Robinson's classroom that morning wearing jeans, a t-shirt, and house slippers. He was very angry. He had a tape recorder and played a message left on Robinson's answering machine by McMahon (whom appellant did not know), but which appellant believed had been left by a friend of theirs named Shawn Crutcher. Appellant said, "So you're f——ing Shawn." Appellant then went into the hall and verbally assaulted Melton, who was talking with a counselor. He played the tape for Melton, and said, "Who the f—— is this?" Later that day, the Nissan Pathfinder Robinson drove to work was missing from the school parking lot; in its place was appellant's vehicle, a Maxima, with the tires slashed.

Appellant phoned Crutcher twice that day. He played the tape, accused Crutch-er of having an affair with Robinson, and threatened to kill him.

Appellant persuaded Robinson to allow him to accompany her to Chicago to visit her family for the Thanksgiving holiday. While in Chicago, Robinson told appellant she was filing for divorce. Appellant said that, if he ever caught her with anyone else, "there would be drama." Robinson phoned McMahon from Chicago twice, and, during one of those conversations, asked for his address.

Appellant and Robinson returned to Houston from Chicago on Friday, November 28, 1997. The following Sunday, November 30, McMahon and Robinson spoke on the phone twice and made plans to have dinner together that night. Robinson was to meet McMahon at his apartment after he got off work at 6:00 p.m. Between 4:00 and 5:00 p.m., appellant left in the Pathfinder, ostensibly to return to Louisiana.

However, when Robinson drove through the gate and into the parking lot of McMahon's apartment complex, she met appellant driving the Pathfinder. According to Robinson, the look on appellant's face was "the same look that he had when he walked in [her] classroom." They made eye contact, and Robinson was so terrified that she turned around and immediately left. She did not see where appellant went. That evening, McMahon's next door neighbor, Carol Jackson, heard loud noises from his apartment. It sounded like someone was knocking down the door, then like someone was hitting the common wall between the two apartments. Finally, Jackson heard a moan. Robinson phoned McMahon's apartment all night, but did not get an answer.

The next day, Robinson and Melton went to McMahon's apartment. There was no response when they knocked, but they found the door unlocked. Inside they

made the gruesome discovery of McMahon's body, and called police.

Sgt. Eric Mehl of the Houston Police Department investigated the case. He found six fired .380 caliber cartridge casings in the living room, two fired bullets in the dining room, and one in the freezer. According to Mehl, the killer was there simply to kill, robbery not being a motive. McMahon's wallet was in plain view and undisturbed, as were stereo equipment and other items. In Mehl's opinion, this was an "overkill" murder. McMahon had been shot five times, stabbed 11 times, and his throat had been cut, severing the jugular vein and slashing the carotid artery. Appellant's fingerprint was found on a plastic compact disk case on the kitchen counter. Robinson testified that she had never seen that compact disk before this trial.

Robinson also testified that she and appellant were living together during the broadcasts of the O.J. Simpson trial, and that appellant watched the trial to the point that it sometimes interfered with his work. She further stated that appellant believed Simpson was guilty, but got away with murder.

### Voir Dire

In issue one, appellant contends the trial court erred in overruling his objections to the prosecutor's references to the O.J. Simpson trial during voir dire. In issue five, he contends the trial court erred in overruling his *Batson*[1] objection to the State's use of its peremptory challenges against minority venirepersons based on their agreement with the Simpson verdict.

### A. References to O.J. Simpson Trial

In his first issue presented, appellant asks whether the trial court erred in overruling appellant's objection to references to the O.J. Simpson trial during voir dire. Appellant claims he objected to any reference to the O.J. Simpson verdict, and the trial court overruled the objection.[2]

When the prosecutor stated he would like to know each juror's opinion on the O.J. verdict, the record actually reflects the following objection, which interrupted the prosecutor's explanation as to what he was not going to ask about: "I'm going to object to the reference to the O.J. verdict as it relates to homicide cases as it indirectly relates to this defendant, myself or cocounsel." The trial court overruled appellant's objection. When the prosecutor resumed his explanation, he stated that he was not interested in the politics or media spectacle, but in the jurors' thoughts about what they understood the evidence to be, whether they thought the verdict was right or wrong, or whether they just did not follow it. Appellant then obtained a running objection to any question regarding the O.J. verdict. Thus, appellant's stated basis for his objection to any question regarding the O.J. verdict was limited to its relation to homicide cases directly and appellant and his counsel indirectly.

Appellant's objection at trial does not comport with his argument on appeal. Appellant does not state a separate basis for his first issue presented for review, but rolls four of his issues together. His global complaint on appeal is to prosecutorial misconduct that violated appellant's right

---

**1.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**2.** While the State does not argue waiver, we note that defense counsel also made a reference to the O.J. Simpson trial in explaining how much weaker the case against O.J. would

have been if there had been no blood. Apparently, it was impossible for either party to stay away from the O.J. Simpson case as a source of illustrations to explain matters relevant to this case.

to due process because appellant was entitled to be tried based on the allegations in the indictment, not allegations against O.J. Simpson. Appellant's most important reason why any comparison of appellant to O.J. Simpson was improper is because the Simpson case was racially polarizing, with the vast majority of African Americans believing the verdict was proper and an equally vast majority of whites believing Simpson was improperly acquitted. There was no mention of such racial polarization in appellant's trial objection to the prosecutor's questions during jury selection.[3]

Under these conditions, appellant's trial objection does not comport with his argument on appeal in regard to the prosecutor's questions during jury selection. Therefore, appellant did not preserve his first issue.[4] *See Coffey v. State,* 796 S.W.2d 175, 179 (Tex.Crim.App.1990) (a point of error that does not comport with the trial objection presents nothing for review).

We overrule issue one.

### B. *Batson* Motion

In issue five, appellant asks whether the trial court erred in overruling his objection to the State's use of peremptory challenges on minority veniremembers based on their belief that the O.J. Simpson verdict was correct. He argues that agreement or disagreement with the outcome of the Simpson case is not racially neutral.

█ The State does not dispute that appellant established a prima facie case under *Batson.* 476 U.S. at 96, 106 S.Ct. at 1723. The burden of production then shifted to the State to come forward with race-neutral explanations. *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995); *Ford v. State,* 1 S.W.3d 691, 693 (Tex.Crim.App. 1999).

█ A reason is deemed race-neutral so long as no discriminatory intent is inherent in the explanation given, even if the explanation is fantastic or implausible. *Williams v. State,* 937 S.W.2d 479, 485

**3.** Neither did appellant object that the prosecutor's question was racially discriminatory on its face, as the dissenting opinion believes. *But see Harris v. State,* 996 S.W.2d 232, 236 (Tex.App.—Houston [14th Dist.] 1999, no pet.) (characterizing a prosecutor's question asking whether veniremembers agreed with the O.J. Simpson verdict as race neutral in a case similarly involving DNA testing); *see also State v. Snyder,* 750 So.2d 832, 846 (La. 1999) (prosecutor's reference to the O.J. Simpson case as a shorthand of circumstantial evidence during closing argument not prejudicial); *Carroll v. State,* 701 So.2d 47, 52 (Ala.Crim.App.1997) (striking of potential jurors because of their response to prosecutor's questions about the O.J. Simpson trial held to be racially neutral where both black and white jurors were struck); *Ridley v. State,* 235 Ga.App. 591, 510 S.E.2d 113, 118 (1999) (striking of potential jurors because of their unresponsiveness to prosecutor's questions about the O.J. Simpson trial held to be not racially motivated); *State v. Schexnayder,* 685 So.2d 357, 370 (La.Ct.App.1996) (prosecutor's

reference to the O.J. Simpson case while commenting on the availability of DNA evidence not prejudicial where defendant had not given a blood sample); *Olsen v. State,* No. A–6509, 3839, 1998 WL 351259 (Alaska Ct.App. July 1, 1998) (unpublished) (judge's passing comment about the O.J. Simpson trial while instructing the jury on direct and circumstantial evidence held non-prejudicial).

**4.** The dissenting opinion begins by mischaracterizing this holding as "Without reservation, the majority holds that it is proper, during voir dire, for the prosecutor to inquire of each prospective juror, without ever discussing or inquiring about legal concepts or personal motives, if he or she thinks the outcome of the O.J. Simpson verdict is right or wrong." Lest there be any misunderstanding, we do not hold the questioning here was proper. Indeed, below we characterize it as improperly trying to commit jurors to a set of facts. Nevertheless, our unmistakable holding is that the issue was not preserved for review.

(Tex.Crim.App.1996). If a race-neutral reason is given, the trial judge must then decide whether the opponent of the strike has proved purposeful racial discrimination. *Purkett,* 514 U.S. at 767–68, 115 S.Ct. at 1770–71. The burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *Id.; Ford,* 1 S.W.3d at 693.

In examining a *Batson* claim on appellate review, the reviewing court must determine whether the trial judge's findings were clearly erroneous by examining the evidence in the light most favorable to the trial judge's ruling. *Pondexter v. State,* 942 S.W.2d 577, 581 (Tex.Crim.App. 1996). We must accord great deference to the trial court who was present to assess the credibility of the prosecutor and his explanations. *Hughes v. State,* 962 S.W.2d 689, 693 (Tex.App.—Houston [1st Dist.] 1998, pet. ref'd).

After the jurors' names were announced by the clerk, appellant's counsel objected to the State's use of peremptory challenges against venirepersons numbers 5, 14, 32, and 44 on the basis of *Batson.* The prosecutor began his explanation by pointing out that the victim and virtually all State's witnesses in this case are black. Next, the prosecutor mentioned his conversation with appellant's wife about appellant's fascination with the O.J. Simpson case, how he took off from work to watch it and commented that it was unbelievable that O.J. was able to beat the case when it was so obvious. The prosecutor also pointed out similarities between this case and the O.J. Simpson case.

The prosecutor then gave the following explanations for striking the four veniremembers:

### Veniremember No. 5, Libbie Eckroth

As to Eckroth, she was fast asleep the whole time you were talking. She indicated she couldn't see the board, even though she was in the first row and, most important, indicated that the O.J. verdict was fair, indicating that similar overwhelming scientific evidence or circumstantial evidence exists, she apparently believes that evidence is not enough to convict.

### Veniremember No. 14, Deborah Quiller [5]

Juror No. 14—actually several reasons. First and foremost, I shared this information with Mr. Jones [defense counsel]. I ran a criminal history on at least 40 people on the panel. I believe I have identified strike [sic—should be "five"] people. I believe four of those people are white. I didn't pay attention to their race. I struck the other four people because of prior criminal history and/or convictions.[6] Ms. Quiller, there has been a conviction or had been handled before for the offense of hot checks. She works for Goodwill. She had her hands folded when she spoke with me. She was nodding vigorously with Mr. Jones. And another thing, when Mr. Jones asked a question, before he got to her row as to whether or not people would believe police officers would tell the truth, before she was even asked, she was shaking her head side to side no before she was even asked that question.

---

5. Quiller had no opinion about the Simpson verdict, explaining that she "didn't watch it."

6. The prosecutor later listed the others he had struck for having a prior criminal history: (1) Mr. Jordan, No. 18, had a theft case dismissed; (2) Mr. Maxwell, No. 16, had a drug case no-billed; (3) Mr. Lewellyn, No. 29, had three prior DWIs; and (4) an unidentified person who had a criminal history.

**Veniremember No. 32, Earl Jolivett**

As to Juror No. 32, Earl Jolivett, he stated emphatically not only the verdict was fair, he said flat out O.J. Simpson was not guilty.

**Veniremember No. 44, Robin Robinson**

As to 44, she also indicated to me that O.J. Simpson was a fair verdict. I believe I struck all people black and white who indicated they thought the verdict was fair.

Appellant's counsel argued that the issue of the Simpson verdict allowed the prosecutor "to strike jurors along an ethnic line." However, the prosecutor countered that he peremptorily challenged venireperson number 18, Mark Jordan, a white male, who believed the Simpson verdict was accurate.

The record supports the prosecutor's statement about Jordan who said, "If I was on that jury, from what I understood, I wouldn't have found him [Simpson] guilty." The record also reflects that the prosecutor peremptorily struck veniremember number one, Belinda Pearce, who stated, "I thought with the evidence that was provided to the jury that it [the Simpson verdict] was adequate." The defense did not complain that the State's peremptory challenges of Jordan and Pearce were racially motivated. The record thus supports the prosecutor's statement that he struck all members of the venire, black and white, who indicated the Simpson verdict was fair.

During his argument on the *Batson* motion, defense counsel stated that the majority of the veniremembers either said they did not pay attention or they were uncertain. He also expressed surprise at the prosecutor's statements about appellant's fascination with O.J. Simpson's having gotten off, because this information

had not been in the State's file. Explaining Ms. Quiller's shaking of her head, defense counsel said many folks were shaking their heads. In reference to Ms. Quiller's worthless check, defense counsel said it was a Class C misdemeanor that would not disqualify from jury service. Defense counsel also claimed that the prosecutor had not exercised peremptory strikes on white veniremembers who thought the jurors in the O.J. Simpson case had considered the evidence and whatever they decided was fine. The prosecutor took issue, stating that each and every veniremember who agreed with the O.J. Simpson verdict had been struck.

The trial court overruled the *Batson* objection, finding that the State's explanations were racially neutral.

■ We agree with the trial court that the prosecutor's explanations were racially neutral, and appellant's efforts to undermine them were not convincing. Under these circumstances, there should be no alternative but to uphold the trial court's exercise of discretion. The dissenting opinion would hold that asking prospective jurors their opinions of the O.J. Simpson verdict demonstrates per se the prosecutor's determination to remove all blacks from the jury because it is common knowledge that the Simpson trial had a polarizing effect on the American public. Disregarding the fact that the prosecutor struck anyone, black or white, who agreed with the Simpson verdict, the dissenting opinion would hold that the prosecutor engaged in racially discriminatory behavior.

The prosecutor may have been trying to gain an unfair advantage by trying to commit jurors to a set of facts based on the similarity of the O.J. Simpson murder case and this case. Nevertheless, that was neither the basis for appellant's objections at trial, nor does that indicate any improper *racial* motives on the part of the prosecu-

tor. Indeed, the prosecutor pointed out that the victim and nearly all of the State's witnesses were black. What the prosecutor was apparently trying to do was to keep any prospective juror off the jury who would find appellant not guilty despite very strong circumstantial evidence similar to that in the O.J. Simpson case. What the prosecutor did may have been improper. *See Atkins v. State,* 951 S.W.2d 787, 789 (Tex.Crim.App.1997) (it is improper to ask veniremembers if they could convict based on a hypothetical in an effort to commit the venire to particular circumstances). From this record, however, there is no showing that what the prosecutor did was racially motivated.

Therefore, we uphold the trial court's exercise of discretion in having believed the prosecutor's explanation that his peremptory strikes were not racially motivated. We overrule appellant's fifth issue.

### Testimony of Lisa Robinson

■ In issue two, appellant contends the trial court erred in overruling his objection to the State's direct examination of his wife, Lisa Robinson, concerning appellant's interest in the O.J. Simpson trial. Appellant alleges that the State's references to the Simpson case amounted to prosecutorial misconduct.

Concerning the Simpson case, the State questioned Robinson as follows:

[Prosecutor]: I want to also go back in time as to when the O.J. Simpson trial was going on. Okay?

[Defense Counsel]: Judge, I would object and I would have a continuous objection. I would have an objection based on my previous motion.[7]

The Court: Overruled. I'll give you a running objection.

[Defense Counsel]: No, sir. I want the Court to consider my previously filed motion—my motions I previously filed and make a ruling on my motions.

The Court: I overrule your motion.

[Prosecutor]: Just a few questions about that, okay?

[Robinson]: Okay.

[Prosecutor]: When the O.J. Simpson trial was going on, where were you and the defendant living?

[Defense Counsel]: May I take her on voir dire, Judge?

The Court: Counsel, you're going to get to ask her these on cross-examination. Is there some reason you need to voir dire at this time?

[Defense Counsel]: Yes, sir.

The Court: About where she was living on that date?

[Defense Counsel]: No, sir. I want to ask—

The Court: What [are] you going to voir dire on?

[Defense Counsel]: I'm going to ask specific questions about the O.J. Simpson case, her fantasy, if her response is based upon hearsay or her responses are based upon some personal knowledge.

The Court: That will be overruled.

[Defense Counsel]: Please note our objection.

The Court: All right.

[Prosecutor]: Were you living with the defendant when the O.J. Simpson criminal trial was going on?

[Robinson]: Yes, I was.

7. Defense counsel did not specify the motion or motions to which he referred in the trial court, nor does he do so on appeal.

[Prosecutor]: How much attention did the defendant pay to the O.J. Simpson criminal trial?

[Defense Counsel]: I object to that. That was a six-month trial, and I would want the questions to be more definite as to when. I object to any analysis as to any O.J. Simpson trial or any questions here or these questions that are so open-ended, runs broad spectrum of the phase of the trial.

The Court: Overruled.

[Prosecutor]: How much attention did he pay to it?

[Robinson]: He watched it constantly, day and night. He recorded it every day.

[Prosecutor]: Did he ever call in sick to watch it live?

[Defense Counsel]: I object to that as being leading.

The Court: Counsel, I was trying to hear his question and you objected before he finished and I couldn't hear it. What was the question?

[Prosecutor]: I'll rephrase the question. Did it ever interfere with the defendant's work schedule, his obsession with the trial?

[Defense Counsel]: I object to that. It assumes facts not in evidence. I object to the form of question interposing obsession. I object to her conclusion relative to whether or not it had any bearing on his work.

The Court: Counsel, she was married to him and she was with him. That's testimony. If she knows. You can answer that question.

[Defense Counsel]: I object to the form of the question.

The Court: Okay. Overruled. Overruled.

[Defense Counsel]: Counsel's testifying, Judge.

The Court: Pardon?

[Defense Counsel]: That's part of the objection. He is testifying.

The Court: Who's testifying?

[Defense Counsel]: Counsel.

The Court: Don't testify, counsel. Ask her a question and don't suggest the answer.

[Prosecutor]: Did the trial ever interfere with the defendant's work schedule?

[Robinson]: Just if he stayed up extremely late at night watching it.

[Defense Counsel]: I object to that not being responsive. That called for a yes or no.

The Court: Overruled.

[Prosecutor]: I'm going to ask you one last question about that and we'll move on. What was the defendant's opinion about the result of that trial as to whether or not O.J. was guilty and whether or not the verdict was the right verdict?

[Robinson]: He thought he was guilty and he got away with murder.

[Defense Counsel]: Your Honor, I object to that.

The Court: Overruled.

[Prosecutor]: I don't think the jury heard your answer. One more time?

[Defense Counsel]: Judge, what was the question?

The Court: You objected to it. I guess you heard it, counsel.

[Defense Counsel]: I don't think I did, Judge. I'm going to hold my objection.

The Court: I hate to run it through again.

[Prosecutor]: What was the defendant's opinion regarding whether or not O.J. was guilty and whether or not the verdict was—

[Defense Counsel]: I object to the form of the question. Multifarious question. Calls for two different answers and one calls for her sense of his presence at a particular time.

The Court: Overruled.

[Prosecutor]: Thank you, Judge.

[Robinson]: He thought he was guilty but that he got away with murder.

Appellant's complaint in this Court, that the State's questioning amounted to prosecutorial misconduct, was not raised in the trial court. At trial, appellant's counsel objected that the State's questions were indefinite, open-ended, leading, multifarious, and assumed facts not in evidence. He further objected to "the form of the question," and that counsel was testifying. Because the point of error does not comport with the complaints raised in the trial court, nothing is presented for review. *See Guidry v. State*, 9 S.W.3d 133, 152 (Tex.Crim.App.1999); TEX.R.APP. P. 33.1(a)(1).

We overrule issue two.

### State's Jury Argument

■ In issues three and four, appellant contends the trial court erred in overruling his objections to the State's jury argument at the guilt stage. Appellant argues that the comments injected new and harmful facts into the case and amounted to prosecutorial misconduct.

The arguments of which appellant complains were made during the State's opening argument to the jury, as follows:

[Prosecutor]: How about the fact that it's just a huge coincidence that the vehicle Lisa sees him in happens to be at a house that's not his house and not his place of work. I guess that's just a huge coincidence. It would be so important, but there's so much other strong evidence. I mean, it's so significant, not

that it's an insignificant fact, but in light of all this other evidence, *similarities to the O.J. case, about six or eight. Jealous man, prior instances, goes someplace, spying on his wife, confrontations—*

[Defense Counsel]: I would continue to object to any O.J. reference.

The Court: That will be overruled.

\*  \*  \*

[Prosecutor]: *You got to figure anybody with half a brain, let alone a college-educated person, who followed the O.J. Simpson trial would know you got to get rid of the murder weapon and the clothes.* They could be anywhere between here and Monroe.

[Defense Counsel]: Judge, may I have a running objection?

The Court: Yes.

(Emphasis added.)

■ As with appellant's first two issues, his third and fourth issues are not preserved by comporting trial objections. Here, the objections stated no basis. A general objection may be sufficient to preserve error, if the basis is obvious from the context. TEX.R.APP. P. 33.1(a)(1)(A) (requiring a specific objection "unless the specific grounds were apparent from the context"). Even if the first objection made reference to some indefinite prior objection, it is impossible to tell what specific objection appellant had in mind. Appellant's objections to mentioning the O.J. Simpson trial had been many and varied throughout the trial. We have already mentioned most of them above, such as: "as it relates to homicide cases as it directly relates to this defendant, myself or co-counsel"; indefinite; open-ended; leading; multifarious; and assuming facts not in evidence. None of these comport with appellant's complaints on appeal that the prosecutor's arguments injected new and

harmful facts into the case and amounted to prosecutorial misconduct.

Under these conditions, we hold that appellant's trial objection does not comport to his argument on appeal. *See Coffey*, 796 S.W.2d at 179. Accordingly, we overrule issues three and four.

## Conclusion

We affirm the judgment of the trial court.

En banc review was requested and granted by a majority of the Court.

Chief Justice SCHNEIDER and Justices HEDGES, NUCHIA, BRISTER, and JENNINGS join the en banc opinion.

Justice BRISTER, concurring.

Justice MIRABAL, dissenting, joined by Justice WILSON.

Justice PRICE, dissenting.

Justice COHEN, recused.

Before the Court en banc and Justice PRICE.

BRISTER, Justice, concurring in the en banc opinion.

I fully join in the majority opinion and concur in the judgment. I write separately to point out that reducing the number of peremptory challenges—as recommended by many judges, legal commentators, and the American Bar Association—would temper the claims of bias, racism, and other heated charges that often arise in cases like this.

It appears to me that defense counsel's real objection in this case was not so much as to *how* the State used its peremptories as to *how many* it had to use:

This thing, retrying the O.J. Simpson case, this is an all-white jury, there were no more than in the first group if [sic]

we had an opportunity to choose from four black people. Those who said they couldn't be fair, we agreed on. Whether or not someone believes that the O.J. Simpson case was or was not a travesty does not mean that that person can or cannot be fair. [The prosecutor] has luxury, Judge. He has out of 72 people at least 65 to 66 who are white who are on this jury panel—on Friday it was even worse—that I object.

It appears from this exchange that voir dire was conducted twice, and in both instances there were fewer black members on the venire than defense counsel expected or hoped.

Texas law guarantees 10 peremptory strikes to both the State and the accused in felony cases in which the death penalty is not sought. TEX.CODE CRIM. PROC. ANN. art. 35.15(b) (Vernon Supp.2001). This is twice as many as recommended by the ABA. COMMITTEE ON JURY STANDARDS, AMERICAN BAR ASS'N, STANDARDS RELATING TO JUROR USE AND MANAGEMENT 76–82 (1993) (standard 9(d)(ii)). More than half of the states allow six or less peremptory strikes in such cases. G. THOMAS MUNSTERMAN ET AL., JURY TRIAL INNOVATIONS 233 (1997). Because of this abundance, the prosecutor had the "luxury" of eliminating all black members of the venire, and even more white members.

Given the diversity of our state and nation, it is impossible to assure a representative cross-section on each jury. *Batson v. Kentucky*, 476 U.S. 79, 86 n. 6, 106 S.Ct. 1712, 1717 n. 6, 90 L.Ed.2d 69 (1986). But we can take steps to make jury selection better. Peremptory challenges tend to make juries less representative. MUNSTERMAN, *supra* at 78; Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury*, 73 TEX. L.REV. 1041, 1052–66 (1995). By cutting them to the levels used in most states, the Legislature

could reduce the need for large venire panels as well as the occasions in which *Batson* becomes an issue.

MIRABAL, Justice, Dissenting from the en banc opinion.

Because I am persuaded that the O.J. Simpson question in this case was destined to result in the exclusion of the Blacks from the jury, I dissent. It is significant that, during voir dire, the prosecutor made no effort to learn the basis for any prospective juror's opinion about the O.J. Simpson verdict. Further, the prosecutor did not discuss any legal aspects of the O.J. Simpson case. Rather, simply, if a prospective juror agreed that the O.J. Simpson "not guilty" verdict was "fair," the prosecutor struck that prospective juror. We should not sanction skirting around *Batson*[1] by condoning the peremptory strike of a member of a particular minority based solely on one answer to one question about which a vast majority of that minority have been demonstrated to agree.[2] I would sustain issue five.

WILSON, Justice, joins this dissenting opinion.

FRANK C. PRICE, Justice (Assigned), dissenting from the en banc opinion

The majority sets a bad precedent for permissible questions and acceptable strikes to eliminate prospective African American jurors in future criminal cases.

Without reservation, the majority holds that it is proper, during voir dire, for the prosecutor to inquire of each prospective juror, without ever discussing or inquiring about legal concepts or personal motives, if he or she thinks the outcome of the O.J. Simpson verdict is right or wrong. Then the majority holds it permissible, *i.e.*, race neutral, for the State to peremptorily strike all prospective African American jurors who state the verdict is fair, so long as it strikes any white veniremembers who answer similarly.

Pursuant to a *Batson*[1] challenge, appellant questioned the prosecutor's motive for striking prospective African American jurors numbered five, 14, 32 and 44.

The record reflects that during voir dire, the following occurred:

[Prosecutor]: I'd like to know your opinion on the O.J. verdict. Not about—

[Defense Counsel]: I'm going to object to the reference to the O.J. verdict as it relates to homicide cases as it indirectly relates to this defendant, myself, or co-counsel.

The Court: Overruled.

[Prosecutor]: My point is not all about the politics and the media spectacle. Based on what you understand the evidence to be, did you think it was the right verdict, wrong verdict, or you just didn't follow it? Just tell me what you think of that.

**1.** *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986) (holding that prosecutor may not use peremptory strike against prospective juror solely on account of race, or on the assumption that Black jurors as a group will be unable to impartially consider the State's case against a Black defendant).

**2.** In the present case, every Black venireperson who had formed an opinion, agreed that the O.J. Simpson verdict was fair. The fact that one or two Whites agreed with the O.J.

Simpson verdict and were also struck does not validate the process.

**1.** In *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), the Supreme Court held that the Equal Protection Clause forbids the prosecutor from using peremptory challenges against potential jurors solely on account of their race, or on the assumption that African American jurors as a group will be unable impartially to consider the State's case against an African American defendant.

The last thing I'd like to ask—

[Defense Counsel]: I'm sorry, Judge. May I have a running objection with any question with regards to the O.J. verdict?

The Court: Yes.

As voir dire developed, the following occurred regarding the four minority panel members:

[Prosecutor]: Juror No. 5, Mrs. Eckroth? Is that right, ma'am?

[Eckroth]: Yes.

[Prosecutor]: What'd you think of the O.J. verdict?

[Eckroth]: Which one, criminal or civil?

[Prosecutor]: Criminal.

[Eckroth]: I thought it was fair.

\*  \*  \*

[Prosecutor]: Juror No. 14, Mrs. Quiller?

[Quiller]: Yes.

[Prosecutor]: What'd you think of the O.J. verdict?

[Quiller]: I didn't watch it.

\*  \*  \*

[Prosecutor]: Juror No. 32, Mr. Jolivett? What'd you think of the O.J. verdict?

[Jolivett]: Not guilty.

[Prosecutor]: You thought he was not guilty?

[Jolivett]: (Shaking head.)

\*  \*  \*

[Prosecutor]: Juror No. 44, Ms. Robinson?

[Robinson]: Correct.

[Prosecutor]: What'd you think of the O.J. verdict?

[Robinson]: It was a fair verdict.

At the conclusion of voir dire, both sides made their strikes. After the jury was seated, appellant made his *Batson* motion challenging the State's reasons for striking African American panel members numbered five, 14, 32 and 44. During a discussion between the State, the defense and the court, the record reflects the prosecutor stated the following:

Judge, you're not aware of this because we hashed this out with Judge Shaver on Friday. First of all, the victim in this case is black. Virtually all of the witnesses are black. I don't see how a black person's wife becomes an issue. Another thing you're not aware of that we went over with Judge Shaver, I met and spoke with this defendant's wife at length. One of the things this defendant's—defendant was fascinated with the O.J. Simpson case. He took off work to watch the O.J. Simpson trial and he said it was unbelievable that he was able to beat the case when it was so obvious. Also, a lot of the circumstances is [sic] similar, attack against spouse, spouse who left him, brutal overkill.

The prosecutor thereafter gave the following reasons for the peremptory challenges of the African American veniremembers:

1. Ms. Eckroth, number five, was falling asleep, could not see the board even though she was on the first row and, "most important, indicated that the O.J. verdict was fair, indicating that if similar overwhelming scientific or circumstantial evidence exists, then she apparently believes that evidence is not enough to convict."

2. Ms. Quiller, number 14, had been "handled" for hot checks, works for Goodwill; bad body language.

3. Mr. Jolivett, number 32, stated emphatically that O.J. was not guilty.

4. Ms. Robinson, number 44, stated that the O.J. Simpson verdict was fair.

The prosecutor, before the voir dire process had concluded, informed the trial judge that there were many factual similarities between the case he was presenting and the O.J. Simpson trial. When asked by a white veniremember why he was inquiring about the Simpson trial, the prosecutor stated that if that person was subsequently selected to serve on the jury, the question probably would make sense during trial. The prosecutor, however, made no effort during the interrogation of prospective jurors to discuss any aspect of the O.J. Simpson case from a legal or factual standpoint, or to pursue the reasons for the opinion each prospective juror expressed as to its outcome. He only alluded that the facts of the two cases were similar.

During his objections to the State's reasons for making its strikes, appellant's attorney complained that the O.J. Simpson case divided the nation based on race and stated it was wrong to allow the State to strike jurors along ethnic lines just because they agreed with the verdict. The trial court judge admitted that the O.J. Simpson case was well known, but nevertheless held that the State's explanation for striking the African American panel members was a race neutral reason.

It is interesting that the prosecutor made a statement to the trial court that the victim was black, all witnesses are black and a black person's wife should not be an issue, and then struck all African Americans to keep them off the jury. It should have been obvious to the trial court judge that this was the prosecutor's intention all along, and the question and answer was the easiest and most consistent method for the prosecutor accomplishing his desired result.

The majority views this as a discretionary standard, according deference to the trial judge, "who was present to assess the credibility of the prosecutor and his explanations." As such, it holds the prosecutor must have been telling the truth when he claimed his strikes were not racially motivated because the trial court did not grant appellant's *Batson* challenge. During my 27 years of service presiding over criminal cases, I have yet to see a prosecutor, in the face of a *Batson* challenge, confess that his strikes were racially motivated.

One should examine the entire record to try to determine the prosecutor's motive for asking the O.J. Simpson question, and whether it supports the trial judge's decision that the question was race neutral, thus, allowing the State justification for striking African American panel members. The "supported by the record" standard is an analytical tool used in determining whether a trial judge's findings of fact are clearly erroneous or should be accorded great deference. *Vargas v. State*, 838 S.W.2d 552, 554 (Tex.Crim.App.1992).

We need not give deference to the trial court's findings because they do not turn on the credibility of either the prosecutor's stated motive for exercising his peremptory challenges on African American panel members, or such members' reaction to the Simpson verdict. The prosecutor admitted he struck all panel members who expressed an opinion the Simpson verdict was fair. This does not require a credibility evaluation, whether or not the prosecutor believed it was a race neutral reason. The fact he did not inquire into the thought processes of the African American members to determine if their opinions were based on the quality of the evidence, or just part of a group bias caused by the polarizing effect that developed when the Simpson case received national attention in

the media,[2] is evidence, however, the prosecutor intended to eliminate all African Americans from the jury panel, regardless of how their opinions were formulated. The clearly erroneous standard, and not a discretionary standard, should be applied to determine if the trial judge erred when he declared that the prosecutor's reasons for striking the African American panel members were race neutral.

Regarding veniremember number five, Libbie Eckroth, the prosecutor informed the trial judge the most important reason for striking her was because she stated that the O.J. verdict was fair. He further stated that her opinion indicated if there was similar overwhelming scientific evidence or circumstantial evidence introduced in a case, she apparently would not consider it sufficient to convict. The prosecutor made this assumption without discussing with the panel generally or with Eckroth specifically the concept of circumstantial evidence, the significance of scientific evidence, and without ever asking her on what she based her opinion that the verdict was fair. The record does not support such an assumption by the prosecutor. The prosecutor informed the court he likewise struck panel members number 32, Earl Jolivett, and number 44, Robin Robinson, for merely stating the verdict was fair. The prosecutor further indicated he struck all panel members, white and black, who agreed with the Simpson verdict.

Because African American veniremember number 14, Deborah Quiller, told the prosecutor she had no opinion about the Simpson result, the prosecutor informed the court he had various other reasons for striking her. He stated he ran a criminal history on her, along with several other panel members. He claimed she either had been convicted or had been handled for hot checks. He apparently was unsure. He should have known that had she been convicted, this would have been considered a form of theft which legally would have disqualified her from sitting on the jury.

The record does not disclose whether the criminal history information the prosecutor claimed to have accessed applied to Quiller. He never said how he related the information to her and he never inquired of Quiller if the information was accurate, and if it was, whether there was an explanation. He merely used this general conclusory reasoning, which may or may not have been true, to justify striking her.

He further informed the trial court he struck her because she was employed by Goodwill. The record is silent why Goodwill employees make bad jurors. The prosecutor then stated when he addressed her, her hands were folded, but neglected to indicate why this was significant.

The prosecutor complained that Quiller nodded vigorously when the appellant's attorney spoke to the group. As justification for this comment, the prosecutor related that when appellant's attorney was inquiring about police officers' veracity, Quiller shook her head "no" before the people on her row were asked the question directly.[3] The prosecutor could not have

**2.** *See* U.S. News Story Page at http://cgi.cnn.com/US/9610/17/oj.trial (visited April 19, 2001): "The racial make-up of the jury [in the civil trial] could be crucial since opinion polls have consistently showed an America divided over the verdict in Simpson's criminal trial, with most blacks believing in

Simpson's innocence and most whites thinking him guilty."

**3.** Appellant's attorney asked the following question: "Would you be inclined to believe a peace officer, as opposed to anyone else, whatever their testimony may be, simply because the person is a peace officer?"

been upset that she answered the question properly, only that she answered prematurely by nodding her head.

It is no mystery the prosecutor was intending to present his case alluding to its similarities with the O.J. Simpson allegations. He informed the trial court before trial of the many similarities between the two crimes, he mentioned to a prospective juror that his reason for asking the Simpson question would become clear during trial, and he made several allusions to and comparative references with the Simpson case before the jury during trial. He was permitted, over objection, to prove through appellant's wife that appellant was obsessed with watching the Simpson trial and made remarks that O.J. got away with murder. The prosecutor, in an effort to explain the missing weapon and bloody clothes, argued to the jury, without any support in the record, that anyone who followed the O.J. Simpson trial would know to get rid of the weapon and clothes.

In order to carry out his plan, the prosecutor had to eliminate all African Americans from the jury. Simpson was a hero to the African Americans, one of their most successful and recognizable members. He was revered as an icon.

Knowing that he was going to have to vilify Simpson and brand him a murderer in the face of his acquittal, the prosecutor could not take a chance by putting African Americans on the jury regardless of their attitude about the outcome of the Simpson verdict. The Simpson question was the vehicle through which he could strike most, if not all, of the African American panel members. It was not necessary for the prosecutor to explore the attitude of the prospective jurors about the Simpson acquittal. He knew he would be able to strike the majority, if not all, of the African Americans with just their answers to his question. And he was correct because 100 percent of the African Americans on the panel, who allegedly were familiar with the case, thought the Simpson verdict was fair.

It is common knowledge the Simpson trial had a polarizing effect on the American public. It is difficult to find an African American who publicly will admit disagreement with Simpson's acquittal. Likewise, the majority of whites believe he is guilty.

The prosecutor's question had its desired effect with all but one African American panel member. This member, Quiller, had no opinion about the Simpson verdict. Consequently, the prosecutor had to resort to reasons that were extremely weak and tenuous at best to excuse this person. It just goes to prove how necessary it was for the State to eliminate all African Americans from sitting on the jury.

The majority was persuaded by the State's argument that the prosecutor's strikes were not racially motivated because he struck two white prospective jurors who, he claimed, expressed opinions similar to those of the African Americans. Venireman Jordan stated, "If I was on the jury, from what I understood, I wouldn't have found him guilty." The key phrase in that statement is "from what I understood." With this statement, even Jordan questions the validity of his knowledge about the facts in the Simpson case. Unfortunately, we do not know what he understood, or the origin of the source for establishing his opinion, because the prosecutor never explored with Jordan what he meant by his statement.

There is no way to accurately assess the meaning of Jordan's comment. The prosecutor as well as the majority, without justification, just assume he meant something that would justify a strike.

The second white venireperson struck by the prosecutor was Belinda Pearce who

stated, "I thought with the evidence that was provided to the jury that 'it' was adequate." This statement obviously is capable of two interpretations. Again the prosecutor never inquired what Pearce meant the pronoun "it" to reference. Was it that the evidence was adequate to support guilt, or was it that based on the evidence the Simpson verdict was adequate? Without a clarification from Pearce, it would be unfair to interpret the statement either way. As before, the majority assumes "it" refers to "the Simpson verdict" and inserted that phrase in brackets after "it" to justify its position.

The majority then concludes, "What the prosecutor was apparently trying to do was to keep any prospective juror off the jury who would find appellant not guilty despite *very strong circumstantial evidence* similar to that in the O.J. Simpson case." (Emphasis added.) This conclusion is reached without any knowledge of what any prospective juror knew or personally felt about Simpson or any aspect of his case. It just assumes the African Americans were knowledgeable about the evidence, which is all the more reason these strikes were not race neutral.

I have always thought that an opinion is supposed to be a rational, logical and intellectual analysis of the issues and the facts supporting them, not one based on clairvoyant conjecture interpreted by people who do not even claim to be mind readers.

If a question on its face is not race neutral, it does not become race neutral merely because whites who answer similarly to African Americans are subsequently struck by the prosecutor. The State's argument applies only to comparative situations where the State strikes a minority for a reason that on its face is race neutral, then refuses to strike whites who fit the same profile. With the State intending to prosecute its case alluding to similarities

with the Simpson case, it was equally important for the State to eliminate all white panel members who likewise were sympathetic with the Simpson outcome. The State found a convenient way to strike African Americans and, according to the majority's interpretation, picked up two whites along the way.

The majority, in its conclusion, characterizes the evidence in the Simpson case as "very strong circumstantial evidence." If the members truly believe that, then, in light of the makeup of the Simpson jury, predominantly African American, an argument can be made that the acquittal must be the result of a racial verdict. Therefore, if the Simpson verdict was racial, then the prosecutor's reasoning for exercising his strikes in the present case also must be racial.

The concurring opinion presents an interesting perspective. While the writer totally agrees with the majority's rationale and conclusion, he recommends limiting the number of peremptory challenges in criminal cases to conform to attitudes of other organizations around the country. Unfortunately, this is not a solution. Limiting strikes would have no effect on racial discrimination because only one incident of such inappropriate behavior would cause a conviction to be reversed.

I think the majority has done a disservice to Texas jurisprudence with this opinion. In the future, the State, especially in the context of a non-homicide prosecution, will be permitted to ask each prospective juror his or her opinion about the verdict in the O.J. Simpson case and legitimately strike all African Americans who say it is fair, so long as it strikes any white venireperson who answers similarly.

It is unfortunate that we ask African Americans to accept our system of justice as a fair and unbiased application of legal

principles, then refuse them the opportunity to serve on a jury because they claim, in their minds, the system worked.

I respectfully dissent.

I would remand the case to the trial court for a new trial.