Docket No. 90072–Agenda 4–March 2002.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT LEE EVANS, JR., Appellant.

Opinion filed March 18, 2004.

JUSTICE FITZGERALD delivered the opinion of the court:

Following a jury trial in the circuit court of Macon County, defendant, Robert Lee Evans, Jr., was convicted of first degree murder. 720 ILCS 5/9–1 (West 2000). The same jury found defendant eligible for the death penalty and further determined that there were no mitigating factors sufficient to preclude the imposition of that sentence. Subsequently, the trial court sentenced defendant to death. Defendant’s sentence was stayed pending his direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); 720 ILCS 5/9–1(i) (West 2000); 134 Ill. 2d R. 603.

BACKGROUND

On the evening of May 5, 1999, at approximately 11:30 p.m., 19-year-old Jerry Watson received a telephone call at his house in Decatur while he was watching a movie with his sister, Crystal. After a brief telephone conversation, Watson grabbed his car keys, told Crystal he was going to “Little Robert Lee’s” house, and left in his 1991 Chevrolet Caprice. Watson never returned home. At 5:30 a.m. the following morning, his car was found in an alley with the window down, the door unlocked, and the dashboard damaged. At 6:15 p.m., Watson was found dead with 20 separate stab wounds to his body. The stab wounds began at the base of his skull and extended down the back of his body to his buttocks.

Defendant was questioned by the police about Watson’s murder on May 6, 1999. Defendant denied any involvement in the murder and told the police that on May 5, 1999, between 11 p.m. and 11:45 p.m., he was with his cousin at a local liquor store. Defendant told the police that he was home in bed by 1 a.m., and that his younger brother, Marquis, was also home when he went to bed. Defendant said that he last saw Watson one month earlier. When the police confronted defendant with information that people saw him with Watson one week before the murder, he recanted his earlier statement and recalled that he had seen Watson one week earlier and that he tried to contact Watson on May 5, 1999. Defendant then added that in addition to the liquor store he stopped at his Aunt Jackie’s house on May 5, 1999, and that he called Carrie, Watson’s girlfriend, on the telephone from his aunt’s house. He stated, however, that he did not call Watson. Defendant denied killing Watson, and denied having possession of any car stereo equipment.

Defendant then changed his statement when he was informed by the police that they had recovered hidden stereo equipment inside his house. At that time, defendant replied to the police that he “wanted to tell the truth.” He stated that on the night of the murder, at 3 a.m., an individual named Teddy came to his house, woke him up, and offered to sell him stereo equipment. Defendant bought some of the equipment from Teddy for $60. Defendant told the police that he kept the amplifier, but sold the stereo deck to an unknown Caucasian male in his neighborhood. After the police informed defendant that Teddy had an alibi, he asked if he would be released if “he told the truth.” Defendant ultimately implicated his 13-year-old brother, Marquis. Defendant claimed that his earlier statements were lies to protect his brother who had committed the murder.

At trial, the State claimed that defendant murdered Watson in order to take his newly installed car stereo equipment. The State presented the following evidence at trial. Several of Watson’s family members and friends testified that Watson and the defendant were together numerous times, most recently in the weeks before the murder. On the evening of May 5, 1999, Watson was riding around in his car with his sister, Crystal, and three friends, Jason, Tim and Tara. Tara, Tim’s sister, was dating Jason. Several times throughout the evening, Jason’s pager went off with an unknown number. Later in the evening, the group stopped at Jason’s house. At Jason’s house, Tara spoke to Jason’s sister, Carrie, also Watson’s girlfriend. Carrie told Tara that defendant “had been calling” and wanted to speak to Watson, she told Tara that each time defendant called she called Jason’s pager and left defendant’s phone number. Carrie testified about her telephone conversations with defendant on May 5, 1999. She stated that defendant asked if Watson was still driving his Impala–she told defendant that Watson was driving a new car given to him by his mother, a 1991 Chevrolet Caprice. Defendant also asked about the stereo system in Watson’s new car–she told defendant about Watson’s newly installed car stereo equipment. When Watson did not respond to the pages, defendant called a final time and asked Carrie for Watson’s home telephone number.

Tara informed Watson that defendant was looking for him, and Watson did not reply. At 11 p.m., Watson returned home; he and Crystal then watched a movie on television.

Crystal testified that 15 minutes after she and Watson started to watch the movie, the telephone rang. Watson answered and spoke to the caller for three to four minutes. Crystal testified that when Watson hung up the telephone, he grabbed his car keys from the table, but left his money and identification, and indicated that he was going to “Little Robert Lee’s” house and would return shortly. At approximately 2 a.m., defendant had not returned home and Crystal went to bed.

At 5:40 a.m., on her way to work, Watson’s mother observed Watson’s car parked in the alley behind their house. The driver’s window was down, the door was unlocked, and the stereo was missing from the dashboard. She immediately called the police to report that he was missing. The police responded to the scene and discovered that the amplifier, the subwoofer box, the cross-over, the head unit of the stereo, a CD sleeve, and an antenna adapter were missing from the car. Based upon Watson’s comment when he left the house, Crystal went to defendant’s house to ask him when he last saw Watson and if he knew where they could find him. Defendant responded that he had not seen Watson for several days.

Approximately 12 hours later, at 6:15 p.m., the police discovered Watson’s body lying in a field two blocks from defendant’s residence. Defendant lived in his grandmother’s house with his 13-year-old brother, Marquis, his father, his father’s girlfriend, his aunt, and his aunt’s daughter. The police searched the house with defendant’s grandmother’s consent. During the search, the police discovered an amplifier under a bed, subwoofers behind the water heater located in the attic crawl space, a piece of speaker wire on the floor of the kitchen, a piece of speaker wire outside the back door, and an empty knife sheath under the bed next to the amplifier. At trial, several witnesses testified about the likeness of the stereo equipment retrieved from defendant’s home to that of Watson’s stereo system. For example, Watson’s friend who helped install the car stereo system testified that Watson’s amplifier had a velcro strip attached to the top and that one of the contacts had been broken off and that in its place was a cord to complete the connection. The amplifier found in defendant’s home had a similar velcro strip across the top and the same broken connection with a make-shift cord.

The police also discovered a pile of wet clothing near the washing machine in defendant’s home. Specifically, the police recovered gray sweat pants with blood on the knee. After testing the blood, Watson’s DNA profile could not be excluded from the DNA profile present in the blood on the sweat pants. The police also recovered a soaking wet white T-shirt with a bloodstain. The DNA profile gathered from the bloodstain was consistent with Watson such that the profile would be expected to occur in one in 230 Caucasians. Additionally, the police seized a pair of white Reebok tennis shoes; the shoes were damp and smelled of bleach. The shoes testified negative for the presence of blood. A forensic pathologist for the State testified, however, that bleach degrades DNA. Police also gathered a black sweatshirt, a pair of boxer shorts, a turquoise T-shirt, and a second pair of boxer shorts. These items were wet and located next to the washing machine. In the dryer, police discovered a pair of black pants, a pair of socks and a pair of boxer shorts. The same forensic pathologist testified that detergent and hot water can cause the degradation of DNA.

 Marquis testified for the State consistent with his statement to the police on May 6, 1999. Marquis gave his statement to the police in the presence of his father. Marquis stated that he did not know Watson, but saw Watson around town. He testified that on May 5, 1999, he went to bed at midnight. Defendant woke him up during the night and asked for his help at the side door of the house. Marquis testified that defendant’s clothes were soaking wet from the falling rain outside, and that defendant was wearing black pants, a black sweater and white Reebok tennis shoes. Marquis followed defendant to the side door and discovered a stereo system, including a speaker box, amplifier, CD player, and other items he could not recall. Marquis helped defendant put the speaker box in the attic, the amplifier in a bedroom, and the CD player on top of a table in the den. While they moved the equipment, defendant told Marquis, “This is what I stole from Jerry.” Defendant did not give Marquis any further details. Marquis further stated that defendant was wearing black pants when he first came home, but that he changed his clothing and put on gray sweat pants. Marquis further testified that he did not share clothing with defendant.

The State presented the testimony of Correctional Officer Ben Swain. Officer Swain testified that after defendant was arrested on May 7, 1999, he escorted defendant to his cell. He stated that when he walked defendant to his cell at 3 a.m., defendant made the unsolicited statements, “I come up here a lot, and I’ll be here for a long time,” and “I stabbed that guy.” Officer Swain immediately reported defendant’s statement to the detectives in the police department.

On May 7, 1999, following the report by Officer Swain, defendant was questioned by Lieutenant Todd Walker of the Decatur police department. Lieutenant Walker testified that defendant did not make any admissions about the crime, but rather replied to his questions with the statement that “he was going to hell” and that “he was going to take everybody with him.” Lieutenant Walker also testified that he observed a small cut on the little finger of defendant’s left hand.

Ferlandis Scott, defendant’s cousin, also testified for the State. At the time of defendant’s arrest, Scott was in the county jail for an unrelated incident. He admitted that he had hoped to receive leniency in exchange for his testimony, but that he had received no promises. Scott testified that defendant admitted to him that he killed Watson. Specifically, he testified that defendant told him he called Watson from his Aunt Jackie’s house on the night of the murder and asked Watson to meet him. He told Scott that he and Watson rode around in Watson’s car for a while before he told Watson to give him the stereo equipment. Watson replied, “Why you playing me like that? I never done anything wrong to you?” Defendant told him that Watson tried to run, but that he chased him, and when Watson turned and tried to grab him, he “took care of business.” When defendant stated that “he took care of business,” he made stabbing motions to Scott. Defendant also told him that he used his brother’s knife to stab Watson, then buried the knife, and finally took the stereo equipment home, where he made Marquis help him hide it in the house. Scott testified that defendant told him he washed the clothing he was wearing with bleach and detergent to hide the bloodstains before he went to bed.

Defendant presented several witnesses in support of his theory that his brother, Marquis, committed the crime. First, defendant himself testified. Defendant denied killing Watson. He testified that on the night of May 5, 1999, he left his house to buy liquor and cigarettes. After making his purchases, he stated, he went to his Aunt Jackie’s house to call Carrie, Watson’s girlfriend. Defendant stated that he spoke to Carrie, but that she told him it was too late to come over so instead he walked home. According to defendant, he unsuccessfully attempted to buy marijuana on his walk home, but made no other stops during his walk. Defendant stated that he watched television for approximately one hour before Marquis arrived home at 1 a.m. and beckoned him outside. Defendant followed Marquis outside and saw an unfamiliar white Chevrolet Caprice parked in front of the house. Initially, defendant criticized Marquis for bringing the car home. At Marquis’ request, he helped remove the stereo equipment from the car and hide it inside the house. After hiding the equipment, defendant noticed that Marquis was wearing his white Reebok tennis shoes; defendant stated that he and Marquis had limited clothing and as a result shared clothing and shoes. He asked Marquis to wash the shoes because he wanted to wear them the next day. Marquis replied that he would wash the shoes later, after he returned home. Marquis then left the house and returned approximately one-half hour later without the car. Defendant testified that the next morning Marquis admitted to him that he had stabbed Watson.

The State cross-examined defendant about his inconsistent statements to the police before he implicated Marquis. Defendant responded that the lies were to protect Marquis. The prosecutor further cross-examined defendant about his statement to Officer Swain. Defendant replied that Officer Swain misunderstood him. Defendant stated that he did not tell Officer Swain “I stabbed a guy,” but instead said, “They’re trying to say I stabbed a guy.”

Additionally, defendant’s Aunt Jackie testified for the defense. Jackie testified that defendant came to her house on May 5, 1999, at approximately 8 or 9 p.m., but that she went to bed after he arrived and did not know how long he stayed. A second aunt, Tammy Evans, also testified for the defense. She testified that she lived with defendant, and, as opposed to Marquis’ earlier testimony, she testified that defendant and Marquis shared clothing and shoes. She testified that she observed defendant wearing dark jeans on May 5, 1999, but that her recollection was limited because she had been drinking and went to bed at 8:30 p.m.

John Britton, defendant’s cousin who was also incarcerated for an unrelated charge at the time of trial, testified that while he was in jail Ferlandis Scott contacted him and suggested that they falsify a story about defendant in order to receive leniency for their crimes. Britton stated that Scott told him to read the newspapers in order to learn details about Watson’s murder and to repeat those details to the assistant State’s Attorney. Scott told him to tell the police that defendant stabbed a “white guy for some money and the car and some music.” The State impeached Britton with his written statement to the police. In his written statement, Britton detailed a conversation with defendant in the county jail where defendant admitted to the crime and threatened to “kill his grandmother” for helping the police in his case.

Last, the defense presented the testimony of Jason Rhodes, a 28-year-old male who lived near the location where Watson’s body was discovered. Rhodes testified that on the night of the murder he heard a woman screaming, “You killed him! You killed him!” and “I loved him! I loved him!” Rhodes investigated the source of the screaming by jumping over a fence where he observed a woman yelling and hitting a heavy-set male in the chest. Rhodes indicated that the area of the fence he scaled was the same area where Watson’s body was later discovered. He testified that during the fight he observed a parked van with a person in the driver’s seat. The woman led the man towards the van to leave when she noticed that they were attracting attention. Rhodes described the man as 5 feet 10 inches tall, Caucasian, and weighing approximately 260 pounds.

The jury found defendant guilty of first degree murder and returned a verdict finding defendant death-eligible for murder in the course of committing the felonies of robbery, burglary, or attempt robbery, or attempt burglary. Following evidence in mitigation and aggravation, the jury found no mitigating factors sufficient to preclude the imposition of the death penalty. Defendant was sentenced to death. This appeal followed. 134 Ill. R. 302.

ANALYSIS

In his direct appeal, defendant raises seven issues: four guilt-phase issues and three sentencing-phase issues.

However, while this appeal was pending, former Governor George Ryan commuted defendant’s death sentence to natural life imprisonment without the possibility of parole or mandatory supervised release. 
People ex rel. Madigan v. Snyder
, No. 95663 (January 23, 2004). After petitioner’s sentence was commuted, this court issued an order retaining jurisdiction. Although petitioner is now serving a life sentence, we continue to have jurisdiction. In the interest of judicial economy, we choose to dispose of this matter, rather than transfer it to the appellate court.

Further, commutation removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence. 
People ex rel. Johnson v. Murphy
, 257 Ill. 564, 566 (1913). An appellate issue is moot when it is abstract or presents no controversy. 
People v. Blaylock
, 202 Ill. 2d 319, 325 (2002). An issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief. 
People v. Jackson
, 199 Ill. 2d 286, 294 (2002). Thus, the commutation rendered defendant’s sentencing-phase issues moot. For this reason, we address only defendant’s four guilt-phase issues in this appeal.

I. Sufficiency of the Evidence

Defendant maintains that the evidence is insufficient to prove him guilty beyond a reasonable doubt. Defendant argues that the evidence was circumstantial; that his evolving statements to the police and his allegedly incriminating statements were simply a misunderstanding; that the testimony against him was unreliable because the witnesses were motivated to lie; and that the evidence showed someone else could have committed the murder.

When a defendant challenges the sufficiency of the evidence, it is not the function of this court to retry the defendant. 
People v. Hall
, 194 Ill. 2d 305, 329-30 (2000). A reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
People v. Young
, 128 Ill. 2d 1, 49 (1989). That is, “ ‘ “[o]nce a defendant has been found guilty of the crime charged, the factfinder’s role as weigher of the evidence is preserved through a legal conclusion that upon judicial review 
all of the evidence
 is to be considered in the light most favorable to the prosecution.” ’ ” (Emphasis in original.) 
People v. Tye
, 141 Ill. 2d 1, 14 (1990), quoting 
People v. Collins
, 106 Ill. 2d 237, 261 (1985), quoting 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant’s guilt.
 Hall
, 194 Ill. 2d at 330.

First, defendant claims that the evidence raises reasonable doubt as to his guilt because the evidence equally implicates his brother, Marquis, in the murder. Evidence is sufficient to sustain a criminal conviction if the evidence satisfies the standard of proof beyond a reasonable doubt. 
Hall
, 194 Ill. 2d at 330. It is not necessary that the trier of fact find beyond a reasonable doubt as to each link on the chain of circumstances. Rather, the trier of fact must find only that the evidence taken together supports a finding of the defendant’s guilt beyond a reasonable doubt. 
People v. Jones
, 105 Ill. 2d 342, 350 (1985). Here, the evidence taken together supports the jury’s verdict.

The State presented evidence that on the night of the murder, defendant made repeated attempts to contact and locate Watson. Defendant himself admitted that on the night of the murder he attempted to contact Watson. The State also presented testimony that on the night of the murder, Watson received a telephone call and that immediately after hanging up the telephone, he grabbed his car keys and stated that he was going to defendant’s house. Next, the State offered evidence that Watson was found with 20 separate stab wounds two city blocks from defendant’s home, and that within defendant’s home the police retrieved an amplifier, large stereo speakers, subwoofers, speaker wires, and an empty knife sheath. During questioning after the murder, detectives observed that defendant had a small cut on his left finger. Defendant had no explanation for the cut at the time of the trial. Regarding the recovered stereo items, witnesses identified some of the equipment as belonging to Watson and other equipment which was identified as of the “same type” previously installed in Watson’s car the week before his murder. One witness testified that during her conversation with defendant on the night of the murder, defendant asked about Watson’s car and his new car stereo equipment.

The State also entered into evidence several items of clothing and shoes from defendant’s home. Although defendant asserted that he shared his clothing with Marquis, Marquis denied this fact, and the clothing containing bloodstains was identified as belonging to defendant. Detectives testified that some of the clothing recovered was wet and soaked with bleach and detergent, while other clothing was found in the dryer having been recently washed. A forensic scientist testified that some of this clothing contained human blood. Tests indicated that the gray sweat pants contained a mixture of DNA profiles and Watson’s profile could not be excluded, and that a white T-shirt contained a bloodstain with a DNA profile consistent with Watson’s DNA profile. Further, Marquis identified the clothing offered into evidence as the clothing worn by defendant on the night of the murder.

In addition, the State presented defendant’s evolving statements to the police as evidence of his guilt. Particularly, defendant first told the police that he last saw Watson one month earlier but, when presented with conflicting information, admitted that he was with Watson one week earlier. Further, defendant first stated that on the night of the murder he went to the liquor store with his cousin and returned home 45 minutes later, and went to bed at 1 a.m. Defendant, however, changed his statement and told the police that he went with his cousin to his aunt’s house to use the telephone, and then returned home. When police detectives presented defendant with the recovered stereo equipment retrieved from his home, defendant implicated an individual named Teddy. When the detectives informed defendant that Teddy had an alibi, defendant changed his statement a fourth time. In his final statement, defendant implicated Marquis.

Defendant, however, argues that his evolving statements to the police were his “initial clumsy attempts to protect his brother” and, therefore, “easily explain the foolish fabrication[s].” Defendant argues that this evidence cannot establish his guilt. When a defendant challenges the sufficiency of the evidence, it is not the province of this court to substitute its judgment for that of the jury on questions regarding the weight of the evidence. 
People v. Digirolamo
, 179 Ill. 2d 24, 43 (1997). It is the function of the trier of fact to assess the credibility of the witnesses, to determine the appropriate weight of the testimony, and to resolve conflicts or inconsistencies in the evidence. 
People v. McDonald
, 168 Ill. 2d 420, 444 (1995). Therefore, reversal is not warranted simply because the defendant alleges “ ‘that a witness was not credible’ ” or that the jury assigned too much weight to a particular piece of evidence. 
People v. Brown
, 185 Ill. 2d 229, 250 (1998), quoting 
People v. Byron
, 164 Ill. 2d 279, 299 (1995). A jury is not obligated “to accept any possible explanation compatible with the defendant’s innocence and elevate it to the status of reasonable doubt.” 
People v. Herrett
, 137 Ill. 2d 195, 206 (1990); 
People v. Manning
, 182 Ill. 2d 193, 211 (1998) (“speculation that another person might have committed the offense does not necessarily raise a reasonable doubt of the guilt of the accused”).

In this case, the jury was presented with conflicting testimony. Defendant’s explanation of the retrieved stereo equipment and his conduct on the night of the murder were contradicted by Marquis’ testimony. Marquis testified that his brother woke him up on the night of the murder. At defendant’s request, Marquis helped defendant carry stereo equipment into the house. Marquis testified that defendant admitted that he stole the equipment from Watson, but did not mention that he murdered Watson. Marquis also identified the clothing taken from the house by the police as defendant’s, and testified that the clothing was worn by defendant on the night of the murder. It is the jury’s function to resolve the conflicts in the evidence, which they did, against defendant. See 
Hall
, 194 Ill. 2d at 332 (the jury “is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt”), citing 
McDonald
, 168 Ill. 2d at 447.

For these same reasons, we also reject defendant’s arguments that his alleged statement to the detective that “he was going to hell” and “going to take everyone with him” was a misunderstanding and too ambiguous to indicate responsibility, and that his incriminating statement to Officer Swain was a misunderstanding and insufficient evidence of guilt because it is improbable and unreasonable to believe that he confessed to the murder.

Last, we address defendant’s argument that jailhouse informants are unreliable witnesses because they are motivated to fabricate evidence against others in return for leniency and, thus, their testimony cannot be the basis for his conviction. As an initial matter, though Scott testified that he had hoped to receive leniency for his pending felony and misdemeanor charges in return for his testimony against defendant at trial, there is no evidence in the record that his hopes were fulfilled. Nonetheless, regarding defendant’s allegations that Scott’s testimony is unreliable evidence of his guilt, it is well settled that the “credibility of a government informant, as with any other witness, is a question for the jury.” 
Manning
, 182 Ill. 2d at 210, citing 
United States v. Trujillo
, 959 F.2d 1377, 1384-85 (7th Cir. 1992); 
United States v. Molinaro
, 877 F.2d 1341, 1347 (7th Cir. 1989); 
People v. Irby
, 237 Ill. App. 3d 38, 58-59 (1992). Regarding the use of informants our Supreme Court has stated, “The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.” 
Hoffa v. United States
, 385 U.S. 293, 311, 17 L. Ed. 2d 374, 387, 87 S. Ct. 408, 418 (1966).

In the present case, the jury heard opposing accounts from two jailhouse informants and the defendant himself. The jury heard the testimony of jailhouse informant Britton. Britton testified that Scott fabricated his testimony. Further, defendant himself testified that Scott fabricated his testimony. Conversely, however, the State impeached Britton and presented testimony and evidence corroborating Scott’s testimony. For example, on cross-examination of defendant the jury heard defendant admit to having “a lot of conversations” with Scott in the county jail. Defendant further admitted telling Scott that he called Watson on the night of the murder. Consistent with Scott’s testimony, defendant’s clothing contained bleach. Consistent with Scott’s testimony, the blood-tainted and bleached clothing allegedly worn by defendant matched the clothing described by Scott. Consistent with Scott’s testimony, the victim had multiple stab wounds. Further, consistent with Scott’s testimony, the recovered stereo equipment matched the stolen items described by Scott. The jury heard defendant’s claims that Scott gathered his detailed knowledge about the clothing worn by defendant from the newspaper, and that by luck Scott made up facts that happened to be accurate, such as the presence of bleach on defendant’s clothing. On the issue of Scott’s credibility, we will not substitute our judgment for that of the jury.

Additionally, we disagree with defendant’s assertion that his conviction was “based upon” Scott’s testimony. Certainly, Scott’s testimony was relevant; however, absent his testimony there was certainly substantial evidence to sustain defendant’s conviction.

For the aforementioned reasons, we cannot say that the evidence of guilt was so improbable, unsatisfactory, or unreasonable that no rational fact finder could have found defendant guilty beyond a reasonable doubt.

II. Substitution of Judge

Defendant argues that the trial court erred when it denied his motion for a substitution of judge. Defendant asserts that he was entitled to an automatic order of substitution pursuant to section 114–5(a) of the Code of Criminal Procedure of 1963, which provides:

“(a) Within 10 days after a cause involving only one defendant has been placed on the trial call of a judge the defendant may move the court in writing for a substitution of that judge on the ground that such judge is so prejudiced against him that he cannot receive a fair trial. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion.” 725 ILCS 5/114–5(a) (West 2002).

Under the statute, a motion for substitution must be granted if the defendant satisfies five criteria: (1) the motion is timely filed; (2) the motion names only one judge unless the defendant is charged with a Class X felony; (3) the motion is made in writing; (4) the motion alleges that the trial judge is prejudiced against the defendant such that the defendant cannot receive a fair trial; and (5) the motion is made before any substantive rulings in the case. 
People v. McDuffee
, 187 Ill. 2d 481, 487-88 (1999). The instant case concerns the timeliness of defendant’s motion to substitute.

As an initial matter, because section 114–5(a) involves defendant’s right to a fair trial, a right of a constitutional dimension, “ ‘the provisions of the statute are to be construed liberally.’ ” 
McDuffee
, 187 Ill. 2d at 488, quoting 
People v. Walker
, 119 Ill. 2d 465, 480 (1988). A liberal construction of the statute, however, does not mean that a motion will be considered to have been timely filed in all cases. The statute provides that motions for substitution must be filed within 10 days after a cause has been placed on the trial call of a judge. 725 ILCS 5/114–5(a) (West 2002). The commencement of this 10-day period, however, is not uniform. This is true because the assignment of judges to a cause varies in Illinois. In 
McDuffee
, this court discussed the practice of judicial assignments:

“In Illinois, there is no statute or supreme court rule which requires that the assignment of judges be made in a formal, written fashion. Indeed, in some judicial circuits, ‘[i]t is the customary, if not the daily, practice for circuit judges and associate judges to be assigned specific cases, or even transferred to different counties by personal or oral telephone assignments. [Citation.]’ The procedures for assigning judges vary from circuit court to circuit court, and the rules of a given circuit court may not require formal judicial assignment orders in all cases. [Citations.]” 
McDuffee
, 187 Ill. 2d at 489-90.

Because assignments are not uniform, courts examine timeliness using the “charged with knowledge” test. Under this test, a motion is timely if it is filed within 10 days of when a defendant could be “charged with knowledge” that the judge has been assigned to his or her case. 
McDuffee
, 187 Ill. 2d at 490. This examination is case specific and depends upon the record presented in each case. See 
McDuffee
, 187 Ill. 2d at 490.

Here, a review of the record shows that defendant’s motion for substitution was untimely and, therefore, properly denied. Defendant was charged by information on May 11, 1999. Subsequently, the case was assigned to Judge Greanias as a “felony A” assignment. On 12 separate days, between June 1, 1999, and May 15, 2000, defendant appeared before Judge Greanias in courtroom 3A. Subsequently, on January 6, 2000, defendant appeared before Judge Greanias in courtroom 3A to discuss the matter of continuances. At that time, Judge Greanias urged both sides to move the case along and set a special status date to monitor trial readiness. Pursuant to the January 6, 2000, order, on February 10, 2000, the parties reappeared and defense counsel informed the court that he required more time to prepare for trial. Judge Greanias responded:

“I would like to pick a date for the trial even if it’s in May, and we can all work toward that and plan our absences and things like that around it.

* * *

*** Now, your attorneys have indicated that it will be–they need until May to prepare for a trial.

Shall we set this for the first day of the first week of the Jury Term, May 15?”

The parties agreed to the May 15 trial date, and the docket statement notes: “Case is set for jury trial on May 15, 2000 at 9:00 a.m. in courtroom 3A.” On May 15, 2000, the parties appeared before Judge Greanias and were informed by the court that the trial would commence at 9:30 a.m. Defense counsel responded to Judge Greanias with a motion for substitution of judge. Judge Greanias denied the motion:

“We have two felony calenders, an A and a B. By administrative orders that are entered in this court, the Felony A Calendar is assigned to me. At the present time, those cases are picked by computer. *** All of the cases that are on my calender, I try, if possible. This Court takes care of all the pretrial proceedings. It is true that, on the day of trial, we do multiple booking of cases, and if this Court has more trials to commence than one on a day, it will assign it to another judge, if a judge is available.”

The case proceeded to trial, and after trial in his posttrial motion defendant argued that the trial court erred in denying his motion to substitute Judge Greanias. Defense counsel argued that in Macon County the parties are not apprised of who will preside over a case until the day of trial. To support his position, defense counsel discussed Macon County’s two calendar system for felony trials, and referred to Judge Greanias’ order denying the motion as evidence that cases are not assigned until the day of trial. Particularly, defense counsel claimed that the possibility of reassignment due to administrative conflicts made it impossible to know the trial judge until the day of trial; therefore, the 10-day period cannot begin until the day of trial. Judge Greanias denied the motion, and in his written order provided:

“On the first day of trial, May 15, 2000, defendant filed a section 114–5(a) motion for substitution of judge naming Circuit Judge John K. Greanias. The motion was denied on the basis that it was untimely. As the Illinois Supreme Court noted in 
People v. McDuffee
, 187 Ill. 2d 481 (1999), the test for calculating the 10-day period set forth in section 114–5(a) does not depend upon the existence of a formally executed assignment order. The 10-day period commences with the date on which the defendant could be ‘charged with knowledge’ that the judge at issue had been assigned to the case.

On January 6, 2000, the defendant and his attorney were present for a hearing with Judge Greanias. The Court and counsel discussed trial preparations, and the Court set the case for a ‘special status date’ on February 10, 2000. The ‘special status date’ was not a routine docket call. It is clear in the record that the February 10 hearing was a trial call proceeding for final scheduling by the judge and public defenders who were assigned to participate in the trial of this capital case. The defendant was present at the February 10 pretrial proceeding. He and his attorneys actively participated in the final trial arrangements with the [
sic
] Judge Greanias. At the February 10 pretrial proceeding Judge Greanias stated: ‘I would like to pick a date for the trial even if it’s May and we can all try to work toward that and plan our absences and things like that around it.’ It is evident that on February 10 the defendant and his attorneys were aware that Judge Greanias was the assigned judge, and that he was reserving a special date on his calender for this capital case to ensure that he would be available for the trial.

The defendant’s contention that he did not know that his capital case had a trial judge assigned until the day of trial is contrary to the record. The Court finds that as of February 10, 2000, the defendant is charged with knowledge that his case was on the trial call of Judge Greanias.”

We agree. On February 10, 2000, Judge Greanias and counsel for the State and defendant selected a date for trial to accommodate the schedules of all those involved and to avoid potential scheduling conflicts. Defendant had appeared before Judge Greanias on twelve separate times before the cause was set for trial, and it is evident from the discussion that occurred on February 10, 2000, that the matter was to be tried before Judge Greanias. We reject defendant’s assertion that in Macon County a defendant charged with a felony is generally not apprised of a trial judge until the day of trial. Circuit courts must assure timely trials, and with this assurance comes obvious administrative concerns and constraints. Macon County’s two felony calendar system is an administrative system designed to assure timely trials and to address inevitable instances of scheduling conflicts. The mere possibility that a case may be assigned to another judge because of a scheduling conflict does not mean that the case was not assigned to the judge in the first instance. In this case, the record demonstrates that on February 10, 2000, defendant was apprised that Judge Greanias would preside over the trial. Defendant’s motion for substitution was not timely and, therefore, properly denied.

III. 
Strickland

Defendant claims that his counsel was ineffective in two instances. Defendant argues that his counsel was ineffective because he failed to object to the admission of Officer Swain’s testimony that defendant told him, “I come up here a lot, and I’ll be here for a long time. I stabbed that guy.” Defendant also argues that his counsel was ineffective because he failed to object to the admission of Britton’s statement, offered by the State for impeachment purposes, that defendant said he would “kill his grandmother” for helping the police. Defendant asserts that the statements constituted evidence of other crimes, and that his counsel’s failure to object or move to redact the statements denied him a fair trial. Alternatively, defendant argues that the assistant State’s Attorney was obligated to redact the statements.

Claims of ineffective assistance of counsel are reviewed under the two-prong test set forth in 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Under 
Strickland
, a defendant must prove that (1) counsel’s performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense in that absent counsel’s deficient performance there is a reasonable probability that the result of the proceeding would have been different. 
Strickland
, 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068; 
People v. Evans
, 186 Ill. 2d 83, 93 (1999). Under the first 
Strickland 
prong, defendant must demonstrate that his attorney’s performance fell below an objective standard of reasonableness.
 People v. Enoch
, 122 Ill. 2d 176, 201 (1988); see also 
People v. Stewart
, 104 Ill. 2d 463, 491-92 (1984) (“Effective assistance of counsel refers to competent, not perfect representation”). Regarding the second 
Strickland
 prong, a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome–or put another way, that counsel’s deficient performance rendered the result of the trial unreliable or fundamentally unfair. 
People v. Enis
, 194 Ill. 2d 361, 376 (2000). A reasonable probability of a different result is not merely a possibility of a different result. 
People v. Towns
, 157 Ill. 2d 90, 106 (1993), quoting 
People v. Gacy
, 125 Ill. 2d 117, 129-30 (1988). To prevail, a defendant must satisfy both the performance and prejudice prongs of 
Strickland
. 
People v. Sanchez
, 169 Ill. 2d 472, 487 (1996).

Turning to defendant’s first claim of ineffective assistance of counsel, generally the admission of other-crimes evidence to demonstrate a defendant’s propensity to commit crime is prohibited. 
People v. Nieves
, 193 Ill. 2d 513, 529 (2000). However, it is not reversible error if defendant is not prejudiced or denied a fair trial by the admission of the evidence. 
Nieves
, 193 Ill. 2d at 530. In 
Nieves
, the assistant State’s Attorney read to the jury a portion of the defendant’s court-reported statement that included a reference to the defendant’s participation in “other incidents.” 
Nieves
, 193 Ill. 2d at 529-30. On appeal, the defendant argued that the reference to “other incidents” lacked probative value and constituted evidence of other crimes. We held that the admission was improper, but that it did not warrant reversal. Specifically, we held: “[A]ny prejudicial effect that may have been produced by this one isolated and cryptic reference to defendant’s criminal activity in New York was overshadowed by the substantial evidence of defendant’s guilt–most notably, his own uncontested statement.” 
Nieves
, 193 Ill. 2d at 530; see also 
Towns
, 157 Ill. 2d at 106 (rejecting defendant’s ineffective assistance of counsel claim, holding that the defendant was not prejudiced by the introduction of the remarks, “ ‘I would go back to jail’ ” and “ ‘I can’t go back to jail’ ”).

Similarly, the admission of defendant’s isolated and cryptic statement did not deny defendant a fair trial. The statement was brief and nonspecific, and certainly overshadowed by extensive evidence of defendant’s guilt. Further, we find that defendant’s claim does not satisfy the performance prong under 
Strickland
. Defense counsel’s failure to object to testimony may be a matter of sound trial strategy, and does not necessarily establish deficient performance. 
People v. Graham
, 206 Ill. 2d 465, 478-79 (2003); see also 
People v. Pecoraro
, 144 Ill. 2d 1, 13 (1991) (“As a general rule, trial strategy encompasses decisions such as what matters to object to and when to object”). At trial, defendant argued that Officer Swain was mistaken and that defendant never made the alleged statement to Officer Swain. It is highly possible that defense counsel allowed the statement to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement. This possibility seems more likely when considering that at trial defendant maintained that the statement was fabricated. Therefore, because defendant does not satisfy both 
Strickland
 requirements, his claim fails.

Turning to defendant’s second 
Strickland
 claim, defendant contends that he was prejudiced by his counsel’s failure to object to a statement read and submitted to the jury by the State. For impeachment purposes, the State read defense witness Britton’s written statement. In this statement, Britton told the police of his discussion with defendant wherein defendant said when he prevailed in this case he was “gonna kill his grandmother” because she helped the police in the murder investigation. Defendant argues that the admission of this statement permitted the jury to conclude that he was guilty because he said he would kill his grandmother.

As an initial matter, the admission of testimony regarding defendant’s threats was not error and could have been considered by the jury as evidence of defendant’s guilt; therefore, counsel was not deficient for failing to object. The statement was relevant to demonstrate defendant’s consciousness of guilt. See 
People v. Bean
, 137 Ill. 2d 65, 108 (1990) (testimony that defendant threatened to kill his co-conspirators was relevant to show defendant’s consciousness of guilt); 
People v. Turner
, 128 Ill. 2d 540 (1989) (it was not plain error to admit testimony that defendant told his cell mate he would kill anyone who interfered with his escape); 
People v. Baptist
, 76 Ill. 2d 19, 27 (1979) (evidence that defendant attempted to kill a witness was relevant to show consciousness of guilt). More importantly, however, we reject defendants claim of error because Britton’s statement was not entered substantively. The statement was admitted for impeachment purposes, and the jury was properly instructed of this purpose.

IV. Closing Arguments

Last, defendant argues that he was denied a fair trial by the assistant State’s Attorney’s remarks during rebuttal argument. In rebuttal, the prosecutor began with the following statement:

“Now, the Defendant talks about tunnel vision. And you see there’s certain words, catch phrases, defense attorneys can draw on when they address juries, and when O.J. Simpson had his difficulties, we all know the magic words. ‘Rush to judgment.’ And, then, for months afterwards, every attorney gets up and tells the Jury, ‘It’s a rush to judgment.’ Well O.J. is old. He’s still playing golf, and, now, you use ‘tunnel vision.’ ”

Defendant maintains that the clear implication from this argument is that, like O.J. Simpson, defendant is guilty and, unlike O.J. Simpson, defendant should not escape justice. Put another way, the acquittal of defendant would be no different from the acquittal of O.J. Simpson. Defendant further maintains that by this statement the prosecutor compared defendant’s attorney to the attorneys in the O.J. Simpson case in order to suggest that defendant’s attorney was trying to win unfairly. Defendant maintains that this constitutes reversible prejudice because the jury may have focused upon concerns raised following the O.J. Simpson case, rather than the particular facts of his case. Particularly, defendant asserts that the comments implied that the defendant’s “smoke and mirror” defense was illegitimate and that the jury should disregard this defense and convict defendant to avoid the ridicule accompanying an acquittal.

The State first argues that the issue is waived. Defendant’s attorney failed to object to these comments at trial and further failed to raise the issue in his posttrial motion. Nonetheless, on the merits of the issue, the State argues that while the reference to O.J. Simpson may have been inappropriate, defendant overstates the impact that the statement may have had on the jury. The State posits that the statement was not an attack on defense counsel, but rather a response to defense counsel’s theme phrase during closing statements that the police and prosecution had “tunnel vision” and failed to do a thorough investigation or investigate other suspects. Therefore, according to the State, the statement in its proper context did not deprive defendant of a fair trial.

Defendant concedes that he failed to properly preserve this issue for appeal. He requests, however, that we consider the issue under the plain error exception to the waiver rule. Courts of review may consider a waived error under the plain error doctrine in two circumstances, where the evidence is closely balanced and where the error is of such magnitude that it denied the accused of a fair and impartial trial. 134 Ill. 2d R. 615(a); 
People v. Keene
, 169 Ill. 2d 1, 16 (1995). The accused is denied a fair and impartial trial where the prejudice reveals a total breakdown in the integrity of the judicial process. 
Keene
, 169 Ill. 2d at 17. We find that this issue does not present an appropriate circumstance in which to relax the waiver rule and consider the issue on its merits.

As already discussed, the State presented a strong case. The State presented witnesses who testified that defendant made repeated attempts to contact Watson on the night of the murder, in addition to Watson’s own statement prior to his murder that he was going to meet defendant. The State presented witnesses who testified that defendant made inculpatory statements, and introduced evidence concerning defendant’s continually evolving statements to the police as he was confronted with evidence that contradicted his statements. The State introduced evidence of the Watson’s stab wounds, and highlighted the unexplained cut on defendant’s finger observed the day after the murder. The State further introduced evidence stolen from Watson’s car and retrieved from defendant’s home, in addition to defendant’s bloodstained clothing gathered from his home that contained a DNA profile consistent with Watson’s DNA profile. The evidence, therefore, was not closely balanced.

While the prosecutor’s comments were ill-advised, they do not constitute reversible error. Generally, prosecutors have wide latitude in the content of their closing arguments.
 Hall
, 194 Ill. 2d at 346;
 People v. Macri
, 185 Ill. 2d 1, 48 (1998). Statements must be considered in the context of the closing arguments as a whole (
Macri
, 185 Ill. 2d at 48), and counsel may comment upon defense characterizations of the evidence or case (
People v. Jones
, 156 Ill. 2d 225, 252 (1993)). Further, in the context of rebuttal argument, “when defense counsel provokes a response, the defendant cannot complain that the prosecutor’s reply denied him a fair trial.” 
People v. Hudson
, 157 Ill. 2d 401, 445 (1993); see also 
Hall
, 194 Ill. 2d at 346 (prosecutors may respond when defense comments clearly invite a response);
 People v. Brown
, 172 Ill. 2d 1, 43 (1996) (“Because the comments were invited, they cannot be relied upon as error on appeal”); see also 
People v. Pearson
, 52 Ill. 2d 260 (1972) (courts must consider closing argument as a whole and should not focus on selective phrases or remarks). A reviewing court will find reversible error based upon improper comments during closing arguments only “if a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that ‘real justice [was] denied or that the verdict of the jury may have resulted from the error.’ ” 
Jones
, 156 Ill. 2d at 247-48, quoting 
People v. Yates
, 98 Ill. 2d 502, 533 (1983); see also 
Keene
, 169 Ill. 2d at 18.

In this case, the prosecutor’s remarks were not made to compare defendant to O.J. Simpson, but were comments in response to defense counsel’s theme during closing argument. See, 
e.g.
, 
State v. Taylor
, 650 N.W. 2d 190, 207 (Minn. 2002) (prosecutor’s comparison to O.J. Simpson did not warrant a new trial); 
Perdomo v. State
, 829 So. 2d 280, 281 n.1 (Fla. App. 2002) (the prosecutor’s ill-advised statements concerning O.J. Simpson did not constitute reversible error);
 Shelling v. State
, 52 S.W.3d 213, 217-18 (Tex. Crim. App. 2001) (the prosecutor’s brief mention of the Simpson case as an example of a circumstantial case did not affect the verdict or warrant reversal of the conviction); 
State v. Snyder
, 750 So. 2d 832, 845-46 (La. 1999) (the court deferring to the “good sense and fairmindedness of jurors” held that the prosecutor’s comparison of the defendant to O.J. Simpson “[getting] away with murder” did not influence the verdict); 
State v. Thompson
, 578 N.W.2d 734, 743 (Minn. 1998) (holding that “the evidence of guilt is so overwhelming that a simple review of the facts substantiated by the evidence spins out a web of guilt more persuasive than anything that could be added through the prosecutor’s inappropriate [statements concerning O.J. Simpson]”); 
State v. Jones
, 320 S.C. 555, 557-58, 466 S.E.2d 733, 754 (App. 1996) (the State’s improper reference to O.J. Simpson did not materially prejudice defendant such that a new trial was warranted). Accordingly, waiver aside, the challenged remarks were not so improper and so prejudicial that real justice was denied or that the verdict of the jury may have resulted from the alleged error.

CONCLUSION

For the aforementioned reasons, we affirm defendant’s conviction.

Affirmed
.