2023 IL App (1st) 230045-U

FIFTH DIVISION
September 15, 2023

No. 1-23-0045

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF D.F., a Minor, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 22 JD 00237 |
| v. | ) | |
| | ) | Honorable |
| D.F., | ) | Kathryn Vahey, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's adjudication of delinquency and dispositional order committing the minor respondent to juvenile detention on the offenses of vehicular hijacking and robbery based on the testimony of a single eyewitness were supported by sufficient evidence.

¶ 2    This is a direct appeal from an adjudication of delinquency and a dispositional order of commitment to the Illinois Department of Juvenile Justice. Following a bench trial, the trial court found D.F., a minor, guilty of vehicular hijacking and robbery. Those findings were based on the testimony of the complaining witness. Citing the factors set out in *Neil v. Biggers*, 409 U.S. 188,

199 (1972), D.F. argues on appeal that no rational trier of fact could find him guilty of the charged offenses based solely on this testimony. We disagree and, for the reasons that follow, affirm the trial court's dispositional order of commitment.

¶ 3                                        I. BACKGROUND

¶ 4     The State petitioned for 14-year-old D.F. to be adjudged a delinquent minor and made a ward of the State. It alleged that on January 22, 2022, D.F. committed vehicular hijacking and robbery when, while subject to electronic monitoring in a prior case, he was part of an operation that took by force or threat of force a 2019 Chevrolet Traverse, wallet, credit cards, driver's license, approximately $460 in cash, and a payroll check from Uber driver Gerardo Velasquez Quinoinonez. Because D.F. had prior adjudications of delinquency for aggravated vehicular hijacking, aggravated robbery, and two separate cases of vehicular hijacking, the State prosecuted him as a violent juvenile offender under section 5-820 of the Juvenile Court Act (Act) (705 ILCS 405/5-820(a) (West 2020)). D.F. waived his right to a jury trial under that section (*id.* § 5-820(d)) and the case proceeded to a bench trial on November 14, 2022.

¶ 5     The State called Mr. Quinoinonez, who testified that on January 22, 2022, he was driving his wife's vehicle, a gray 2019 Chevrolet Traverse, for the rideshare company Uber. He had driven from approximately 3:30 a.m. to 10 a.m. and was just starting out again around 1 p.m. when he picked up D.F., whom he identified in court. D.F. sat on the passenger side of the vehicle in the second of three rows of seats, and after a ride of between 15 and 20 minutes, Mr. Quinoinonez was preparing to drop him off in the vicinity of 130th Street and Interstate 94. D.F. did not immediately exit the vehicle, however. The court sustained defense counsel's objection to disclosure of the contents of the conversation at trial, since it had not been disclosed in discovery, but Mr. Quinoinonez testified that following a discussion with D.F, he beeped his horn and turned his

2

vehicle around so D.F. could be let off on the opposite side of the street. He also allowed D.F. to borrow his cell phone. He then turned off and exited the vehicle to assist D.F. with a pair of crutches that D.F. had placed in the rear of the car at the start of the ride.

¶ 6    At this point Mr. Quinoinonez saw that there was another person standing outside the vehicle talking to D.F. and started to feel "like something strange was going on." He returned to the driver's seat, but the second individual opened the door, grabbed his hand, and told him that they were going to rob him and to "turn on the truck." Mr. Quinoinonez turned the vehicle on and drove it forward a couple of feet before this second individual reached in to turn the engine back off and began hitting Mr. Quinoinonez under his left eye. He pulled Mr. Quinoinonez out of the vehicle, and a struggle ensued. D.F., who had exited the car by this point, got into the driver's seat as the second individual yelled to him "where is the gun?" Hearing this, Mr. Quinoinonez stopped struggling. The second individual took money and car keys from Mr. Quinoinonez's pocket, gave them to D.F., and the two of them then drove off with D.F. in the driver's seat.

¶ 7    Mr. Quinoinonez testified that D.F. was not wearing a mask and he could clearly see D.F.'s face when D.F. entered the vehicle. On cross-examination, all Mr. Quinoinonez could recall telling officers at the scene was that the individuals who robbed him were male and Black, dressed in black clothing, and "around 17 years old." Defense counsel played video footage from one of the officer's body camera's, however, in which Mr. Quinoinonez said the individuals who robbed him were "[l]ike 20, like 18." Although this footage does not appear in the record on appeal, the parties agree that this is what Mr. Quinoinonez said in the video and this is also what the trial judge, after playing the clip several times, repeated into the record.

¶ 8    Mr. Quinoinonez did not tell the officers how tall his assailants were or how they wore their hair. He recalled at trial that D.F. had been wearing a hooded sweatshirt with the hood drawn

3

up to cover his hair but acknowledged that he had not provided that detail to the officers. He agreed that he was scared when he talked to the officers and had never had anything like this happen to him before. The officer he spoke with did not speak Spanish, which is Mr. Quinoinonez's first language. Mr. Quinoinonez could not remember if he asked for an interpreter at that time. He did ask for and receive one at trial, though, explaining that this was "[b]ecause I don't speak English very well and I don't understand."

¶ 9       At around 1 a.m. on January 23, 2022, Mr. Quinoinonez went to the police station and was shown a photo array. The officer he met with this time spoke Spanish and Mr. Quinoinonez was given a photo array advisory form in Spanish that he signed after the officer explained it to him. Mr. Quinoinonez understood that he was supposed to see "[i]f [he] recognize[d] the person who had robbed [him]." He circled the photo of D.F, identifying him as his passenger from the day before and the person who had driven off in his car. Mr. Quinoinonez agreed with defense counsel on cross-examination that the officer "said there would be photos of people who might [have] *** been arrested that night." And when counsel asked him, "[s]o as you looked at the photos you were expecting to see an individual who had robbed you; correct?" Mr. Quinoinonez said yes.

¶ 10      The photo array, which we have reviewed, consists of six photographs of young Black male individuals, four wearing hooded sweatshirts and two wearing T-shirts. D.F.'s face is noticeably larger than the other individuals' faces by approximately 10%, and the background he is standing in front of is a dark tan or light brown color, while the backgrounds of the other five photographs are gray. The photo array advisory form Mr. Quinoinonez signed is in Spanish, and just above his signature is written, both in Spanish and English, "[h]e's the one I picked up as a passenger from Uber" and "[h]e's the one who drove the car when they robbed me."

¶ 11      Chicago police sergeant William Wolf testified that, at approximately 11:35 p.m. on

January 22, 2022, he was part of a vehicular hijacking team looking for the stolen Chevy Tahoe. With real-time location data provided by OnStar, the officers found the vehicle parked near 13919 South Grace Street in Robbins, Illinois. They approached on foot and ordered the occupants—two males and a female with an infant—to exit the vehicle. The driver did not comply but instead drove the vehicle over a curb and onto the sidewalk, where it became stuck between a dumpster and a brick wall. One of the males then tried to flee on foot but was apprehended. Sergeant Wolf saw his partner search the vehicle at the scene and testified that a pair of crutches was found inside, though none of the vehicle's occupants appeared to be in need of crutches. D.F. was not one of the passengers in the vehicle when it was found, and Officer Matthew Lucki testified that he arrested D.F. pursuant to a warrant on the afternoon of the following day, January 23, 2022.

¶ 12    The State rested, the trial court denied defense counsel's motion for a directed finding, and the defense also rested without calling any witnesses.

¶ 13    The trial court found D.F. guilty of vehicular hijacking and robbery. The judge began by noting that she had presided over a number of carjacking cases and "generally they are difficult cases because of identification." They "happen quickly," the "[o]pportunity to observe is short," and there is "the pressure of the crime that is happening," meaning "[i]dentification within that short period of time is less certain." The judge noted that unlike in those types of cases, here "there was a 15 to 20 minute car drive where Mr. Quinoinonez was not by any indication concerned or suspicious that something was going on." After that, of course, "things happened very quickly," but the judge reiterated that this did not rest "solely on [Mr. Quinoinonez] stopping at a red light or him stopping at a parking lot and the incident *** happening very quickly." The judge concluded by saying: "It comes down to this, I found Mr. Quinoinonez credible. I found him

5

believable. I found him consistent. I did not find him to answer questions—he would say he didn't know. He would concede things. He was impeached on the age." The judge believed that "language was a factor" in the description Mr. Quinoinonez gave officers at the scene. For her, his credible testimony was alone enough to find D.F. guilty beyond a reasonable doubt of the charged offenses.

¶ 14    The court denied D.F.'s motion to reconsider its findings and the case proceeded to sentencing. Section 5-820 of the Act defines a violent juvenile offender as any minor adjudicated delinquent on a second Class 2 or greater felony involving the possession of a firearm or the use or threat of physical force. 705 ILCS 405/5-820(a) (West 2020). After accepting certified copies of adjudication and disposition orders for a qualifying prior offense, the trial court found that it was in D.F.'s best interest and in the public interest that he be adjudicated a ward of the court. The court committed D.F. as a violent juvenile offender to the Illinois Department of Juvenile Justice for a determinate period of time.

¶ 15                                    II. JURISDICTION

¶ 16    The trial court committed D.F. as a violent juvenile offender to the Illinois Department of Juvenile Justice on December 7, 2022, and D.F. filed a timely notice of appeal from that judgment on January 6, 2023. We have jurisdiction over this appeal pursuant to Article VI, section 6, of the Illinois Constitution; Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. March 12, 2021), governing appeals from final judgments in criminal cases; and Rule 660 (eff. Oct. 1, 2001), governing appeals in cases arising under the Juvenile Court Act.

¶ 17                                    III. ANALYSIS

¶ 18    On appeal, D.F. challenges the sufficiency of the evidence supporting the trial court's findings of guilt and adjudication of juvenile delinquency. "[W]ith the exception of the right to a jury trial, the fourteenth amendment to the United States Constitution extends to delinquent minors

all of the basic rights enjoyed by criminal defendants." *People v. Austin M.*, 2012 IL 111194, ¶ 76. No person, whether adult or juvenile, may be convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he was charged." *In re Winship*, 397 U.S. 358, 364 (1970). The standard we apply here, therefore, is the same well-established standard we apply when considering a challenge to a criminal conviction based on the sufficiency of the evidence.

¶ 19　　Where, as in this case, we review the sufficiency of the evidence, we do not retry the defendant. *People v. Swenson*, 2020 IL 124688, ¶ 35. Instead, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). "The weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact," and "we will not substitute our judgment for the trier of fact." *Id.* "We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of [the] defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 20　　The evidence that we review here was an eyewitness identification. It is well-established that "[t]he testimony of a single eyewitness may suffice to convict if the witness is credible and was able to view the defendant under conditions permitting a positive identification." *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 34. D.F.'s claim on appeal is that no rational trier of fact could find him guilty beyond a reasonable doubt of vehicular hijacking and robbery based solely on the testimony of Mr. Quinoinonez.

¶ 21     The reliability of an identification is a question for the fact finder. *People v. Carroll*, 2019 IL App (1st) 171501, ¶¶ 81-82. In assessing the reliability of identification testimony, courts in Illinois generally follow the factors set out by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972). *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). They include:

> "(1) the opportunity the witness had to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *People v. Starks*, 2014 IL App (1st) 121169, ¶ 48 (2014).

No single factor is conclusive. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. Instead, courts evaluate the reliability of an identification based on the totality of the circumstances. *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 89. D.F. argues that application of the *Biggers* factors in this case supports his claim that Mr. Quinoinonez's identification was too unreliable to be sufficient to sustain D.F.'s adjudication as a delinquent minor.

¶ 22     As to the first of these factors, D.F. argues that Mr. Quinoinonez's ability to observe was limited because his passenger sat behind him and Mr. Quinoinonez was facing forward, his attention focused on driving. But this was the middle of the afternoon, and Mr. Quinoinonez testified that he could clearly see D.F.'s face when D.F. entered the vehicle. Once they arrived at the drop-off location and Mr. Quinoinonez was no longer driving, he also interacted with D.F. for some additional period of time, conferring with him before beeping his horn, moving to the other side of the street, and even letting D.F. borrow his cell phone. Mr. Quinoinonez clearly had a good opportunity to observe his passenger. Courts consider this to be the most important of the *Biggers* factors (*People v. A.A.*, 2023 IL App (1st) 221538, ¶ 18), and it supports the reliability of the

identification in this case.

¶ 23  As to the second factor, the witness's degree of attention, D.F. argues that up until he understood he was being robbed, Mr. Quinoinonez had no reason to pay close attention to his passenger. And after the second person arrived on the scene, he argues, Mr. Quinoinonez's attention would have been focused on that person. These are reasonable inferences from the testimony, but they are not the only ones. When assessing the sufficiency of the evidence supporting a conviction, we must view that evidence in the light most favorable to the prosecution. *Sutherland*, 223 Ill. 2d at 242. Here, it is also reasonable to infer that an Uber driver would want to get a good look at his passenger, that Mr. Quinoinonez would have turned to face D.F. upon stopping the car and conversing with him, and that they would at least have been face-to-face when Mr. Quinoinonez handed D.F. his cell phone. The trial court's observation that, unlike many victims of carjackings, Mr. Quinoinonez had the opportunity to observe one of his assailants while not under the stress of a crime in progress does not mean, as D.F. suggests, that the court was blind to the possibilities D.F. raises. It was for the trial court to decide which reasonable inferences should be drawn from the testimony, and we will not substitute our judgment for that of the trier of fact. *Evans*, 209 Ill. 2d at 209.

¶ 24  As to the third factor, the accuracy of the witness's prior description of the offender, D.F. argues that Mr. Quinoinonez provided "only the vaguest of descriptions" of his offenders to officers at the scene. He said they were both Black males dressed in black clothing, he offered no information regarding their skin tones or hair styles, and he described them as being four to six years older than D.F. was at the time. There was evidence, however, as the trial court concluded, that a language barrier may have prevented Mr. Quinoinonez from giving officers at the scene a more detailed or accurate description of the two individuals. Mr. Quinoinonez also testified that

9

he was still scared when he talked to the police. He had been physically attacked and robbed in broad daylight. Nothing like that had ever happened to him before. The trial court concluded that Mr. Quinoinonez was a credible witness, not because his recollection and testimony were perfect, but because the inaccuracies made sense under the circumstances. The court noted that Mr. Quinoinonez admitted when he did not know the answer to a question, conceded things that were pointed out to him, and was impeached on what he told the officers about the offenders' ages. In sum, the court was convinced beyond a reasonable doubt that what Mr. Quinoinonez said was true: D.F. was his passenger that day. The discrepancies and lack of detail D.F. points to here are insufficient for us to second-guess that assessment of the evidence.

¶ 25    The fourth factor, the level of certainty demonstrated by the witness at the identification confrontation, weighs neither in favor of nor against a finding that the identification testimony in this case was reliable. The parties agree that Mr. Quinoinonez was not asked and expressed no opinion regarding the certainty of his identification.

¶ 26    The fifth factor, the length of time between the crime and the identification confrontation, weighs in favor of a finding of reliability. Here, it was less than 12 hours after Mr. Quinoinonez was robbed that he viewed a photo array and made a positive identification of D.F. as his passenger and as the person who drove off with his vehicle. Although D.F. acknowledges that this was "not an exceedingly long period of time," he points out that it "was not immediately after the incident when the events would have been fresh in [Mr.] Quinoinonez's mind." D.F. cites no authority suggesting that an eyewitness identification must be immediate to be considered reliable and, indeed, that is not the law. In *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36, where we rejected a challenge to an identification made over a year after the crime in that case occurred, we noted that "identifications made after even a longer period of time ha[d] been upheld."

¶ 27    D.F. makes two other arguments for why the photo array identification in this case was untrustworthy. He first argues that Mr. Quinoinonez expected to see the perpetrator in those photographs. On cross-examination, defense counsel asked Mr. Quinoinonez,"[s]o as you looked at the photos you were expecting to see an individual who had robbed you; correct?" and Mr. Quinoinonez said yes. But Mr. Quinoinonez's testimony on direct examination was that he was viewing the photos to see "*if*" he recognized the person who had robbed him. He was given a photo array advisory form in Spanish, his native language; the officer, who also spoke fluent Spanish, explained the form to him; and Mr. Quinoinonez signed to acknowledge that he understood the instructions on the form. Those instructions informed Mr. Quinoinonez that he should not feel obligated to make an identification, that it was just as important to exclude innocent people as to identify the perpetrator, and—critically—that the perpetrator may or may not be presented in the lineup. The evidence as a whole, particularly in light of the fact that Mr. Quinoinonez testified at trial through an interpreter, does not suggest to us that he incorrectly believed the person who had been in his Uber and robbed him was sure to appear in the photo array.

¶ 28    D.F. also points out, as we have already noted, that the photos used in the array make his face appear larger than the faces of the other five individuals. The background of his photo also appears to be a different color than the rest. The State downplays these differences, but we find they are readily apparent. Though he cites no authority, D.F. posits that such differences "could have influenced [Mr.] Quinoinonez to identify [him] from the photo lineup." The State insists that photo arrays with far more noticeable discrepancies have not been deemed impermissibly suggestive. Such cases typically involve a motion to suppress the photo array identification and a hearing in which the identifying witness is questioned regarding the effect, if any, of the challenged aspects of the array on his or her identification. For example, in *People v. Hart*, 10 Ill. App. 3d

11

857, 859 (1973), the defendant's photo was not only larger than the other photos in the array but was also the only one with a date on it (and a date that was just one week after the robbery in that case). The identifying witness credibly testified, however, that he did not notice these differences until after he had made his identification, and this court concluded it was not error for the trial court to deny the motion to suppress under those circumstances. *Id.*

¶ 29    Here, as the State points out, D.F. never filed a motion to suppress Mr. Quinoinonez's photo array identification. Nor did his counsel make a record regarding what effect, if any, the differences in the photos had on Mr. Quinoinonez's identification of D.F. from that array. Although, theoretically, a photo array could be so suggestive that it would be unnecessary to establish such a record, we are not convinced that this is such a case. The cases the State relies on demonstrate that problems with photo arrays do not *necessarily* render them unduly suggestive. Put simply, we may not presume, as the defense asks us to, that these differences impacted Mr. Quinoinonez's photo array identification.

¶ 30    Finally, D.F. points out that he was not found with any proceeds from the robbery, the three individuals found in the stolen vehicle were not linked to him in any way, and those individuals tried to flee from officers. As the State points out, the recovery of proceeds is certainly not necessary to prove robbery. See *People v. Hughes*, 259 Ill. App. 3d 172, 177-78 (1994) (affirming an armed robbery conviction though no firearm or proceeds were found on the defendant's person 20 minutes after the crime took place). And these other arguments about the evidence were made to the trier of fact and rejected. The trial court's finding that D.F. participated in these crimes is sufficiently supported by the evidence.

¶ 31                                    IV. CONCLUSION

¶ 32    Having considered the factors for assessing the reliability of eyewitness identifications, we

find no reason why the trial court was not entitled to rely on the testimony of the complaining witness in this matter as support for its findings of guilt on the charges of vehicular hijacking and robbery. We affirm the trial court's adjudication of delinquency and dispositional order of commitment sentencing D.F. to juvenile detention.

¶ 33    Affirmed.