2020 IL App (1st) 181200-U

SIXTH DIVISION
September 18, 2020

No. 1-18-1200

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 12601 |
| | ) | |
| ANDREW SMITH, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1     *Held*:  (1) The evidence was sufficient to support defendant's conviction; (2) defendant was not entitled to have new counsel appointed for a *Krankel* hearing; and (3) defendant failed to make out a claim of ineffective assistance of counsel.

¶ 2     A jury found defendant Andrew Smith guilty of first degree murder and he was sentenced to 50 years in prison. On appeal, Mr. Smith argues that (1) the trial evidence was insufficient to prove him guilty of murder beyond a reasonable doubt, (2) the trial court erred in denying his claims of ineffective assistance of trial counsel without first appointing a new attorney to assist

him in making those claims, (3) he was denied the effective assistance of trial counsel because his trial counsel did not elicit the testimony that, in his opening statement, he promised the jurors they would hear, and (4) his trial counsel was also ineffective for failing to file a motion to quash Mr. Smith's arrest and suppress evidence obtained in connection with that arrest. For the following reasons, we reject each of those arguments and affirm Mr. Smith's conviction.

¶ 3                                I. BACKGROUND

¶ 4                                A. The Trial

¶ 5      At approximately 6:30 p.m. on July 19, 2016, Anthony Nicholas was shot near 67th Street and East End Avenue in Chicago. He died as a result of his wounds. Mr. Nicholas's girlfriend, Lashieka Washington, testified for the State that she was home when she heard gunshots and looked outside onto East End Avenue, where she saw Mr. Nicholas with a bloody shirt and "a person in all black running away" north toward 67th Street. Ms. Washington stated that she could not see the person's face or hair because "they were fully covered."

¶ 6      Later that night, the police took Ms. Washington to look at Mr. Smith, to see if she could identify him as the same person she had seen running from the scene. She could not make an identification, but she did say that the person she was asked to identify was dressed similarly and appeared to be the same height. She was not sure whether he had the same build as the person she saw fleeing the scene of the shooting. Ms. Washington also testified on cross-examination that she did not know whether Mr. Smith was wearing dark blue pants when she saw him.

¶ 7      When Officer Larry Lanier responded to the call of shots fired at approximately 6:30 p.m., he spoke with the victim, Mr. Nicholas, who provided Officer Lanier with a description of the offender: a black man in all black clothing and wearing a black mask. The officer could not recall a baseball cap being mentioned as part of the description. Officer Lanier then relayed the

description over the radio so that every unit in the area would hear it via a flash message. On cross-examination, defense counsel asked whether Mr. Nicholas "told [the officer] about a Bonneville with temporary plates," to which Officer Lanier responded, "[y]es." On redirect, Officer Lanier explained the context in which Mr. Nicholas mentioned the Bonneville, saying, "I believe at that point he kind of—started to—his condition started to get a little worse so he kind of started mentioning a Bonneville."

¶ 8    Officers Andrew Braun and Arturo Fonseca responded to one or more flash messages. Officer Braun only recalled hearing one flash message describing a black man, approximately 40 years old, dressed in all black, running through yards east of the shooting. Officer Fonseca testified that there were two flash messages—the first describing the shooter as an approximately 40-year-old black man wearing all black, and the second saying that someone observed a man who fit that description running through a yard near 67th Street and Euclid Avenue.

¶ 9    Officer Braun drove to the 6700 block of Jeffery Avenue, and started driving west on 67th Street when the officers saw a man they identified as Mr. Smith. Both testified that Mr. Smith was wearing all black and carrying a black jacket. Officer Braun described Mr. Smith as sweating and breathing hard, and Officer Fonseca testified that Mr. Smith "looked like he was sweating profusely. And he seemed like he was out of breath like he finished running."

¶ 10    As Officer Braun made a U-turn, Mr. Smith started running east on 67th Street. Officer Braun saw Mr. Smith cross to the east side of Chappel Avenue and run into the gangway between the first and second buildings there. Officer Braun saw Mr. Smith drop the jacket he had been carrying as he entered the gangway. The officers briefly lost sight of Mr. Smith when he was in the gangway—Officer Fonseca said for maybe five seconds. Officer Braun drove the car to the alley east of Chappel Avenue to intercept Mr. Smith. As they arrived, the officers saw Mr. Smith

enter the apartment building at 6707 South Chappel Avenue from the gangway. The officers agreed that there were other people in the alley.

¶ 11 Officer Fonseca jumped out of the car and chased after Mr. Smith, running into the doorway they had seen Mr. Smith enter. Officer Fonseca testified that he followed Mr. Smith downstairs, into a basement apartment. Officer Fonseca said that Mr. Smith was "probably about five feet away" when he ran down the stairs and that Mr. Smith closed the door right in front of the officers. Officer Fonseca gave himself about five seconds, then opened the door, which was not locked. Behind the door were a woman and a young girl, and Officer Fonseca saw Mr. Smith come out of the kitchen with his hands up and Mr. Smith was arrested. Officer Braun testified that while processing Mr. Smith's arrest, he learned that Mr. Smith had a warrant out for his arrest on a separate matter.

¶ 12 The police recovered a handgun in the bottom of a kitchen cabinet from the apartment where Mr. Smith was arrested and a black jacket from the grass next to the walkway on Chappel Avenue. There was a black "do-rag" in the jacket. The gun and jacket were turned over to the evidence technician.

¶ 13 Deidra Lester, who was 13 years old at the time of the trial, and her mother, Jeavenia Jones, both testified at trial. On July 19, 2016, they lived in the basement apartment at 6707 South Chappel Avenue. Deidra testified that at approximately 6:30 p.m. on that day, she was sitting on the stoop in front of the apartment building door when she saw a man in "dark jeans and a dark blue sweater" running toward her. She identified that man, both in court and in a photo array, as Mr. Smith. He tried to hand her a gun, but she kept telling him no. She did not see the color of the gun when Mr. Smith was trying to hand it to her, but she told the police that she thought the gun was black. Deidra said that when she did not take the gun, Mr. Smith tried to put the gun down her

pants, but she still refused to take it. When "he knew [she] wouldn't take it," he ran through the door of the apartment building, which had been propped open, and down the stairs, taking the gun with him.

¶ 14    Ms. Jones testified that shortly after 6:30 p.m., she was inside the apartment bedroom when she heard a commotion outside. She left the bedroom to see what was happening and saw a man, who she identified in court and in a photo array as Mr. Smith, walking through her apartment and into the kitchen. She did not recognize him and did not expect anyone to come through her door, so she ran toward the front door. She said that police were also beating down that door. Ms. Jones unlocked the door and the police entered and removed Mr. Smith from her apartment. Ms. Jones said that she did not own any guns or keep any weapons in the house.

¶ 15    Detective Brian Daly viewed a surveillance video from the area of the shooting and said that he "realized [Mr. Smith] was wearing similar gym shoes that [he] saw the offender wearing on the video." Mr. Smith's shoes were recovered and photographed. The surveillance footage was published to the jury.

¶ 16    On cross-examination, the following exchange occurred:

"[DEFENSE COUNSEL] Q. And when you're in this process of talking to these people, you find out that there are three eyewitnesses to the shooting; isn't that true?

[DETECTIVE DALY] A. That's incorrect.

Q. All right. Did you hear that a ten-year-old boy by the name of Lorenzo Green was an eye witness.

A. I learned that information later.

Q. Fair enough. Did you learn that Wilma Means was an eye witness?

A. Yes.

Q. Did you learn Lashieka Washington was an eye witness?

A. Yes."

Detective Daly also testified that he learned from another detective that Mr. Nicholas had talked about a blue Bonneville with temporary plates.

¶ 17    Several officers testified about the forensic evidence. A gunshot residue (GSR) test was administered on Mr. Smith and on the black jacket. The officer who administered the test stated that Mr. Smith was wearing a sweatshirt that was "either real dark navy or black." No residue was detected on Mr. Smith, but there was residue detected on the cuff of the black jacket.

¶ 18    The police recovered four expended nine-millimeter cartridge cases from the area of the shooting. No bullets were recovered from the body of Mr. Nicholas. The gun recovered from the kitchen cabinet was a nine-millimeter semiautomatic Ruger SR9 and the magazine had the capacity to hold 17 rounds. Ten live rounds were recovered from the gun. The testimony was that four live rounds recovered from the scene of the shooting were fired from the recovered gun. Both the gun and magazine were tested for fingerprints, but none were found.

¶ 19    The defense called Lilah Sweet Tanda Benson, who testified that she lived at 6707 South Chappel Avenue. She described the building as having a basement plus three floors, with eight living units, and said she owned two of those units, one each on the second and third floors. On July 19, 2016, Ms. Benson's niece Jeavenia Jones was staying with her. According to Ms. Benson, Ms. Jones was not living in the basement unit, though she may have had "maybe a couple things" in that unit. According to Ms. Benson, she allowed her family to be down in the basement when the kids were on the front stoop because "it was easier than going up to the third floor to use the bathroom and stuff."

¶ 20    Ms. Benson explained that the building had six empty units in July 2016 and there had

been gang activity in the area. The building was not secure, and she said she would find "different people around the neighborhood just in the units." Gang members would also leave things in the vacant units: "I found guns in there. I found rifles in there. I found a big bag of marijuana, like a garbage bag. I found, like cocaine and stuff, just whatever, whatever they want to bring in there, and they want to leave there, they do."

¶ 21 On July 19, 2016, Ms. Benson was walking back to the building from the garbage can in the alley when she saw "this one guy" approach the girls out in front of the building. Ms. Benson described the man as a dark-skinned black man, about six-feet, two-inches tall, and thin. The man approached Deidra and "was right up on her." As Ms. Benson neared, the man darted into the building. The next time she saw the man, the police had him lying on the ground outside the apartment. She never saw the man drop a jacket. Ms. Benson did not know Mr. Smith but had seen him before, outside the building, and testified that he was not the man she saw that night.

¶ 22 The defense then rested its case.

¶ 23 The jury found Mr. Smith guilty of first degree murder and additionally found that he personally discharged the firearm that proximately caused the death of Anthony Nicholas.

¶ 24                    B. Posttrial Matters and Sentencing

¶ 25 On October 12, 2017, Mr. Smith's trial counsel, who was privately retained, informed the trial court that Mr. Smith wanted to make a claim of ineffective assistance of counsel. Mr. Smith reminded the court that, in his opening statement, Mr. Smith's counsel referred to two witnesses— Wilma Means and Lorenzo Green—who he said witnessed the shooting and, when shown a photo array the same day, did not identify Mr. Smith as the shooter. Neither of those witnesses had been called at trial. Wilma Means, according to Mr. Smith, would have testified that he did not match the description of the shooter and that the shooter was wearing a baseball cap, and Lorenzo Green,

7

would have testified that he could not identify Mr. Smith as the shooter.

¶ 26    The trial judge had an exchange with Mr. Smith about his claims. In that exchange, the judge said that he was familiar with the facts of the case and stated that it was "clear" that the witnesses Mr. Smith thought should have been called "would not have claimed that Mr. Smith was not the person. But those persons were apparently documented by police investigative reports as being unable to identify anybody. The fact that they can identify no one in connection with this incident is not synonymous with claiming that someone did not do it." The judge concluded that Mr. Smith did not make the required threshold showing that it was "reasonably possible that he was offered ineffective assistance of counsel" and denied the motion.

¶ 27    Mr. Smith hired a new attorney and on April 5, 2018, the court granted his trial counsel's motion to withdraw and allowed Mr. Smith's new counsel to file an appearance for posttrial matters and sentencing.

¶ 28    Mr. Smith's posttrial counsel made a motion for a new trial, based on the sufficiency of the evidence, which the trial court denied after argument. The court then proceeded to sentencing, and after hearing both aggravating and mitigating evidence, as well a statement in allocution from Mr. Smith, the court sentenced Mr. Smith to 25 years in prison for the murder of Mr. Nicholas plus the 25-year enhancement based on the jury's finding that Mr. Smith personally discharged the firearm that caused the death of Mr. Nicholas, for a total of 50 years.

¶ 29    The court denied Mr. Smith's motion to reconsider the sentence.

¶ 30    This appeal followed.

¶ 31                                    II. JURISDICTION

¶ 32    The court sentenced Mr. Smith on April 5, 2018, and he timely filed his notice of appeal on May 3, 2018. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution

(Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 33                                      III. ANALYSIS

¶ 34    On appeal, Mr. Smith argues that (1) the trial evidence was insufficient to prove him guilty of murder beyond a reasonable doubt, (2) the trial court erred in denying his claims of ineffective assistance of trial counsel without appointing a new attorney to assist him in making those claims, (3) he was denied the effective assistance of trial counsel because his trial counsel did not elicit witness testimony that was promised in his opening statement, and (4) his trial counsel was also ineffective for failing to file a motion to quash Mr. Smith's arrest and suppress evidence obtained at the time of that arrest. We consider each issue in turn.

¶ 35          A. The Trial Evidence Is Sufficient to Sustain Mr. Smith's Conviction

¶ 36    "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). A conviction will only be reversed if 'the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of [the] defendant's guilt.' " *Id.* (quoting *People v. Evans*, 209 Ill. 2d 194, 209 (2004)).

¶ 37    "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48. "It is the function of the trier of fact to assess the credibility of the witnesses, to determine the appropriate weight of the testimony, and to resolve conflicts or inconsistencies in the evidence." *Evans*, 209 Ill. 2d at 211. "Therefore, reversal is not warranted simply because the

9

defendant alleges that a witness was not credible or that a jury assigned too much weight to a particular piece of evidence." (Internal quotation marks omitted.) *Id.* at 211-12. "A jury is not obligated to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." (Internal quotation marks omitted.) *Id.* at 212. It is well-settled that "a criminal conviction may be based solely on circumstantial evidence." *Brown*, 2013 IL 114196, ¶ 49. And the circumstantial evidence in this case, when viewed in the light most favorable to the State, was sufficient to sustain Mr. Smith's conviction.

¶ 38    Mr. Smith argues that the evidence was insufficient to sustain his conviction because no eyewitnesses identified him as the shooter, the State's witnesses were inconsistent in their testimony, and no direct physical evidence linked Mr. Smith to the murder. He also points to the dying declaration of the victim, which he characterizes as a statement that the shooter "entered a Pontiac Bonneville with temporary license plates," his own statements to the court that he was wearing blue pants when he was arrested while witnesses described the shooter as wearing all black, and the fact that he may have run from the police because he had a warrant out for his arrest. While Mr. Smith is right that the evidence was circumstantial and that there was evidence presented that suggested another person was the shooter, as a whole the evidence was not so "unreasonable, improbable, or unsatisfactory" that we can reverse this conviction.

¶ 39    The evidence at trial showed that at approximately 6:20 or 6:30 p.m. on July 19, 2016, Ms. Washington heard gunshots outside of her apartment and when she looked outside, she saw Mr. Nicholas bleeding and "a person all in black running away" toward 67th Street. Although she was unable to identify Mr. Smith as the shooter in the show-up identification, she said that Mr. Smith and the shooter were of similar height and noted that both had on what she described as a black shirt and black pants. The description that Mr. Nicholas provided to the responding officers also

described a black man dressed in all black, with a black mask on.

¶ 40    Officers Braun and Fonseca responded to flash messages immediately after the shooting: the first describing the shooter as a black man, approximately 40 years old, wearing all black and the second stating that a man fitting the description of the shooter was seen running eastbound through a yard at 67th Street and Euclid Avenue. As the officers were driving west on 67th Street, they saw Mr. Smith—whom they both said matched the description—walking quickly east on 67th Street. Both officers also testified that Mr. Smith was sweating and out of breath. Mr. Smith ran as the officers made a U-turn to approach him, and Officer Braun saw him throw a jacket onto the ground as he entered a gangway. The officers intercepted Mr. Smith in the gangway and saw him go into an apartment. Mr. Smith was found coming out of the kitchen of that apartment, and the murder weapon was found in a cabinet in that kitchen.

¶ 41    Both Deidra Lester and her mother, Ms. Jones, identified Mr. Smith in a photo array as the man who entered their apartment and approached Deirdre and tried to hand her a gun. That gun was recovered in their apartment. Four fired cartridge cases recovered from the area of the shooting were identified as having come from the recovered gun. The police also recovered the dropped jacket, the cuff of which tested positive for gunshot residue. In addition, Mr. Smith was wearing shoes that were similar to those seen in surveillance footage worn by the shooter just before and after the shooting.

¶ 42    Mr. Smith contends that these were very common shoes. He also points out that Ms. Benson testified for the defense, in contradiction to the testimony from Deidra and her mother, that the man who ran into the apartment at 6707 South Chappel Avenue that night was *not* Mr. Smith. He emphasizes the victim's statement that the man who shot him got into a blue Bonneville with temporary plates, that Mr. Smith was younger than the flash message description of a man in

11

his 40s, and that he was wearing blue not black pants. Mr. Smith also emphasizes alleged inconsistencies between the testimonies of Officer Fonseca and Ms. Jones about when and whether the apartment door was locked.

¶ 43    First, we note that while Mr. Smith argues that Mr. Nicholas said the shooter got into a blue Bonneville with temporary plates, there is no testimony to support this assertion; rather, the only testimony about a Bonneville at trial was acknowledgment that Mr. Nicholas mentioned a Bonneville with temporary plates This is simply not enough to call into question the rest of the evidence against Mr. Smith. We also acknowledge that there was some inconsistency with respect to the color of Mr. Smith's clothing. Most of the police officers who had contact with Mr. Smith described his pants and shirt as black, Deidra testified that Mr. Smith was wearing dark jeans and a dark blue sweater, and the officer who administered the GSR test said that Mr. Smith was wearing a dark navy or black sweatshirt. We have viewed the photograph of Mr. Smith from the night he was arrested, and the jeans he was wearing are dark enough that assuming they were technically blue, they could certainly have been mistaken for black pants by the witnesses. Most importantly, the jury heard all the testimony about the descriptions of the shooter and Mr. Smith's clothing, and saw the photograph of Mr. Smith that was taken the night of the shooting that showed his pants, and found the evidence sufficient to find Mr. Smith guilty.

¶ 44    Our supreme court has instructed that "[i]t is not necessary that the trier of fact find beyond a reasonable doubt as to each link on the chain of circumstances. Rather, the trier of fact must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *Evans*, 209 Ill. 2d at 209. What Mr. Smith asks us to do is to retry the case on appeal and reconsider witness credibility, which is simply not our role as the reviewing court. The evidence, viewed in its entirety and in the light most favorable to the State, was sufficient to sustain

Mr. Smith's conviction for murder.

¶ 45         B. Appointment of Separate *Krankel* Counsel Was Not Required

¶ 46    Mr. Smith argues that the trial court erred when it failed to appoint him separate counsel

for his posttrial claims of ineffective assistance of trial counsel, as required by *People v. Krankel*,

102 Ill. 2d 181, 189 (1984). "Through *People v. Krankel* and its progeny, the Illinois Supreme

Court has provided our trial courts with a clear blueprint for the handling of posttrial *pro se* claims

of ineffective assistance of counsel." *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 70. Our

supreme court recently outlined that blueprint in *People v. Jackson*, 2020 IL 124112, ¶ 97:

> "New counsel is not automatically appointed in every case when a defendant raises a *pro se*
>
> posttrial claim of ineffective assistance of counsel. Rather, when a defendant makes such
>
> a claim, the trial court should first examine its factual basis. If the trial court determines
>
> that the claim lacks merit or pertains only to matters of trial strategy, then the court need
>
> not appoint new counsel and may deny the *pro se* motion. However, if the allegations show
>
> possible neglect of the case, new counsel should be appointed. [Citation.] The new counsel
>
> would then represent the defendant at the hearing on the *pro se* claim of ineffective
>
> assistance of counsel. The appointed counsel can independently evaluate the *pro se* claim
>
> and avoid the conflict of interest that [the] defendant's trial counsel would experience in
>
> trying to justify his or her actions contrary to the defendant's position."

¶ 47    Relying on *People v. Pecoraro*, 144 Ill. 2d 1 (1991), the State first argues that Mr. Smith

was not entitled to a *Krankel* hearing at all because he was represented by private counsel and later

retained separate posttrial counsel. The defendant in *Pecoraro* argued before our supreme court

that the trial court had erred by failing to appoint new counsel to represent him at the posttrial

ineffective assistance of counsel hearing and requested remand for a new hearing on the matter.

*Id.* at 12. The *Pecoraro* court declined to remand the case, noting that *Krankel* was factually distinguishable from the case before it because (1) the defendant in *Krankel* was represented by an appointed public defender whereas the defendant in *Pecoraro* had retained private counsel to represent him, (2) in *Krankel*, defense counsel had requested a continuance to obtain new counsel for the defendant prior to the motion hearing and that request was denied, whereas no such request was made in *Pecoraro*, and (3) unlike in *Pecoraro*, both parties in *Krankel* agreed that the defendant should have had new counsel argue his posttrial motion. *Id.* at 15-16.

¶ 48    It is the combination of these *three* considerations that convinced the *Pecoraro* court that *Krankel* was inapplicable. We do not agree with the State that *Pecoraro* stands for the broad proposition that *Krankel never* applies to a defendant who is represented by private counsel. Our supreme court itself has implicitly suggested that is not the rule. See *People v. Taylor*, 237 Ill. 2d 68, 78-81 (Burke, J., specially concurring) (noting both that the majority "assumes, without deciding, that *Krankel* applies to privately retained counsel since it addresses the merits of [the] defendant's claim" and that "[t]o read *Pecoraro* as prohibiting a *Krankel* inquiry simply because counsel was retained would conflict with Supreme Court authority and would be a violation of the sixth amendment right to effective assistance of counsel.").

¶ 49    This court has also generally declined to adhere to such a proposition. See, *e.g.*, *People v. Johnson*, 227 Ill. App. 3d 800, 810 (1992) ("we reject the State's argument that under *Pecoraro*, simply because [the] defendant retained private counsel he could not have new counsel appointed for him"). As we explained in *People v. Mourning*, 2016 IL App (4th) 140270, ¶ 20:

> "This court can find no reason why a defendant represented by private counsel
> should be treated any differently than a defendant represented by appointed counsel for
> purposes of *Krankel* ***. The 'conflict of interest that trial counsel would experience if

trial counsel had to justify his or her actions contrary to defendant's position' [citation] exists to the same extent regardless of whether [the] defendant was represented by private or appointed counsel."

The *Mourning* court went on to hold that "*Krankel* applies when a defendant represented by private counsel makes a posttrial *pro se* ineffective assistance of counsel claim and informs the court that he both (1) desires new counsel and (2) cannot afford new private counsel." *Id.* Only then is a trial court required to conduct a preliminary inquiry into the defendant's ineffective assistance claims to determine whether to appoint new counsel to him.

¶ 50     Mr. Smith retained private counsel and never informed the court he wanted new counsel or that he could not afford new counsel. In fact, he hired separate posttrial counsel. Thus, under the facts of this case, following both *Pecoraro* and *Mourning*, the trial court did not err in failing to appoint new counsel for Mr. Smith for purposes of addressing his posttrial claims that his lawyer was ineffective.

¶ 51     C. Claim of Ineffective Assistance Based on Failure to Call Certain Witnesses

Is Not Fully Developed for Consideration on Direct Appeal

¶ 52     Mr. Smith contends that his trial counsel rendered ineffective assistance because he referred to the testimony of Wilma Means and Lorenzo Green in his opening statement but then did not call those witnesses to testify. However, on the record before us, it is unclear what Ms. Means and Lorenzo would have testified to. There was some discussion between the court and Mr. Smith on this issue, with the court expressing the view that they would have simply said they could not make an identification and Mr. Smith insisting that they would have described the shooter in a way that made it clear that he was not the shooter. The only mention of them at trial was during defense counsel's cross-examination of Detective Daly.

¶ 53     Our supreme court has observed that an ineffective assistance of counsel claim "may sometimes be better suited to collateral proceedings *** when the record is incomplete or inadequate for resolving the claim." *People v. Veach*, 2017 IL 120649, ¶ 46. Where, as here, necessary facts are not in the trial record, collateral review is more appropriate. *People v. Williams*, 2019 IL App (3d) 160412, ¶ 34 (citing *People v. Bew*, 228 Ill. 2d 122, 135 (2008)).

¶ 54     Mr. Smith argues that this claim is ripe now because he told the court what he believed Ms. Means and Lorenzo would have testified to, and because his lawyer's unfulfilled promises to call these witnesses is ineffective assistance on its face. However, given the questions as to what these witnesses would have actually testified to, we find this claim would be better suited to proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)), where Mr. Smith would be able to supplement the record with evidence to substantiate his claim.

¶ 55         D. Trial Counsel Was Not Ineffective for Not Moving to Quash Arrest

¶ 56     Mr. Smith argues that his counsel was also deficient for not filing a motion to quash his arrest. We review ineffective assistance of counsel claims pursuant to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To succeed on such a claim, a defendant must generally show both that "counsel's performance fell below an objective standard of reasonableness" and "a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Specifically with respect to challenging counsel's decision not to bring a motion to quash arrest or suppress evidence, "the defendant must demonstrate that the unargued suppression motion is meritorious, and that [a] reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id.* ¶ 15. "The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile." *People v.*

*Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 57 "An arrest executed without a warrant is valid only if supported by probable cause," which "exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Grant*, 2013 IL 112734, ¶ 11. "Probable cause means more than bare suspicion." *People v. Jones*, 215 Ill. 2d 261, 273 (2005). "The existence of probable cause depends upon the totality of the circumstances at the time of the arrest." *Grant*, 2013 IL 112734, ¶ 11. Additionally, "[w]hether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *Id.* "[The] [d]efendant has the ultimate burden of proving lack of probable cause." *People v. Arnold*, 349 Ill. App. 3d 668, 672 (2004).

¶ 58 Contrary to Mr. Smith's contention, the officers here certainly had more than a hunch and, in our view, had probable cause to arrest him. Officers saw Mr. Smith—who they testified matched the description on a flash message of the shooter—sweating and seeming to be out of breath as if he had been running. Then, when the officers made a U-turn on 67th Street, Mr. Smith fled. These facts, taken together, are sufficient to support probable cause to arrest Mr. Smith.

¶ 59 In addition, the gun and the jacket, which Mr. Smith argues were fruits of the illegal arrest, had been abandoned by Mr. Smith at the time they were recovered. Accordingly, Mr. Smith no longer had a right to privacy in his property and the items were properly seized. *People v. Sutherland*, 223 Ill. 2d 187, 230, 233 (2006).

¶ 60 Because Mr. Smith's arrest was legal and the evidence was properly seized, a motion to quash the arrest and suppress the evidence would have been futile. As such, Mr. Smith's trial counsel did not render ineffective assistance in failing to file the motion.

¶ 61                                    IV. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 63    Affirmed.